68 Cal.Rptr.3d 274 (2007)
42 Cal.4th 686
171 P.3d 2
The PEOPLE, Plaintiff and Respondent,
v.
Martin MENDOZA, Defendant and Appellant.
No. S067678.
Supreme Court of California.
November 29, 2007.
*278 Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Marianne D. Bachers, Deputy State Public Defender, for Defendant and Appellant.
Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood, David Delgado-Rucci and Adrianne S. Denault, Deputy Attorney General, for Plaintiff and Respondent.
MORENO, J.
Defendant Martin Mendoza was convicted by a jury of the first degree murders of Sandra Resendes, Eric Resendes, and Wendy Cervantes (Pen.Code, § 187, subd. (a)),[1] as to which the special circumstance of multiple murder was found to be true. (§ 190.2, subd. (a)(3).) Defendant was also convicted of the attempted murders of Julio Cervantes, Antonio Cervantes, and San Bernardino Sheriffs Department Deputies Mark Kane and Stan Gordon (§§ 187, subd. (a), 664), and assault with a semiautomatic firearm on Rocio Cervantes and Sergio Mendoza (§ 245, subd. (b); former § 12022.5, subds. (a), (d)[2]). The jury found true the special allegation that defendant personally used a semiautomatic firearm. (Former § 12022.5, subd. (b)(2).) The jury returned a death verdict. The trial court declined to modify the verdict (§ 190.4, subd. (e)), and sentenced defendant to death on the murder counts. This appeal is automatic. (Cal. Const, art. VI, § 11, subd. (a); § 1239, subd. (b).) We affirm the judgment.

I. Factual Background

A. Guilt Phase

1. Prosecution's Case
Defendant lived with Rocio Cervantes, his wife, in Carson City, Nevada. Living with them were Rocio's two teenage children from a previous relationship, Sandra Resendes and Eric Resendes, and three younger children defendant and Rocio had together, Sergio Mendoza, Martin Mendoza, Jr., and Edwardo Mendoza.
On January 5, 1996, defendant hit 13year-old Sandra with a belt several times for not helping him wash his truck, but stopped after Rocio interceded. Defendant said he would not let Sandra sleep that night, forcing her to stand up all night long as punishment. Rocio left defendant and Sandra alone. When she returned, Rocio heard Sandra crying and telling defendant, "No," and saw defendant pulling Sandra by the hand. Defendant warned Rocio not to interfere, repeating that Sandra was not going to go to sleep that night. Eventually, defendant fell asleep on the couch. Rocio believed something else was going on and dialed 911.
At 3:20 a.m. on January 6, 1996, 911 emergency dispatch received a hang-up call that was traced to defendant's residence. When Carson City Sheriffs[3] Deputies Graunke and Mathews arrived at the residence, Sandra told Deputy Graunke that defendant had arrived home "very intoxicated" and "very angry." Sandra told the deputy that defendant had used a belt to strike her approximately seven *279 times on the leg. Deputy Graunke observed redness and bruises shaped like strap marks on Sandra's legs. The deputies found defendant sleeping on the living room couch and placed him under arrest for domestic battery. Deputy Graunke attached Sandra's witness statement to his incident report. In her statement, Sandra wrote of defendant, "I at [sic ] one time he told me that he was going to touch me and he did." Deputy Graunke's report, however, does not mention the topic of sexual abuse being broached with Sandra or Rocio.[4]
After the deputies arrested defendant and took him to the sheriffs detention facility, Sandra told Rocio that defendant had been sexually molesting her for seven to eight months. Sandra told Rocio that the first time it happened defendant came into her room at night, "hugged her, and was telling her not to yell, that [Rocio] wasn't home, and no one was going to say anything." Sandra also told Rocio that defendant touched her on her breasts, kissed her, "told her that he was never gonna allow her to have a boyfriend." Sandra said defendant told her he "liked her, and not to tell [Rocio] anything" and that "when she was older she was gonna be for him." Sandra also told Rocio that defendant threatened to "kill us" if Sandra told anyone. Sandra told Rocio that defendant had attempted to kiss her that night before he had been arrested.
That same night, Rocio told defendant's brother, Hector, about Sandra's accusations and then took the children and left for the home of her brother, Antonio Cervantes, in Landers, California.
Released on bail the next day, defendant returned home to find an empty house. Defendant phoned Rocio and she confronted him with the details of Sandra's accusations.[5] Defendant denied molesting Sandra and became very angry. Defendant and Rocio spoke on the phone numerous times in the following days, after which Rocio decided to return to Carson City with Sergio, Martin Jr., and Edwardo to attempt a reconciliation with defendant. Rocio left Sandra and Eric in Landers because neither wanted to return. While in Carson City, Rocio again discussed Sandra's allegations with defendant, which he continued to deny. Three days later, Rocio left defendant as a result of Sandra's claims and returned to Landers with the children. After she left, defendant phoned Rocio on six or seven occasions. During those conversations, Rocio and defendant continued to discuss Sandra's accusations, which defendant still denied and which caused defendant to become increasingly angry.
Several witnesses testified that defendant was greatly disturbed by Sandra's accusations and the departure of his family. He felt Sandra had betrayed him by accusing him and that it was her fault that Rocio left and took the children. He was unable to concentrate or go to work. He slept excessively and began drinking heavily and using cocaine. He could not stay at his apartment alone, so he went to his brother Hector's home, where he would *280 fall asleep on the couch. Defendant became unable to take care of his daily responsibilities. Hector urged him to go home to Mexico, put his wife behind him, rest, and collect his thoughts.
Five days before the killings, defendant quit his job. On January 20, 1996, he bought some extra ammunition for a nine-millimeter gun he owned, as well as duct tape and a knife.
On January 24, 1996, defendant borrowed a car from his brother, Hector, to drive to Landers to confront Rocio and Sandra. Defendant asked his nephew, Jose Soria Delgado,[6] to accompany him. On the way, defendant told Soria he intended to kill Rocio and Sandra, adding he would use the knife in case the gun did not work. Defendant's plan was to have Soria drive him to Los Angeles International Airport, from which defendant would fly to Mexico, while Soria returned the car to his uncle.
Defendant and his nephew arrived in Landers at Antonio Cervantes's house around 6:00 a.m. on January 25, 1996. Around 6:30 or 6:45 a.m., defendant went to the house and knocked. Angelica Cervantes, Antonio's daughter, answered the door and defendant told her he wanted to see Rocio. Angelica told Rocio, who came to the door. Defendant was carrying a brown bag and was drinking a bottle of beer. He did not appear drunk, although the smell of alcohol was apparent on his breath. Rocio told him that she had to get the children ready for school. Defendant pleaded with Rocio to come home with him and bring the children. Rocio was not comfortable talking with defendant because she knew he owned a gun and assumed he had brought it with him "because of what we had been through." She came outside to talk to him and let him hold the baby, Edwardo. Defendant held Edwardo for a while, telling him that "he was very little, and he was not involved for [sic] what was going to happen." Rocio asked defendant what he meant by that statement. Defendant smiled and told Rocio to wait and she would soon find out. Rocio took Edwardo and gave him to Angelica and then Rocio went inside the house to get the children ready for school.
Julio Cervantes, Antonio's son, then walked out of the house a little before 7:00 a.m., saw defendant and said hello to him. Julio left, taking his wife and brother to school.
A little while later, Sandra and Wendy Cervantes, Antonio's daughter, told Rocio that defendant was banging on the door, so Rocio went outside again. Defendant asked Rocio whether she was afraid of him. He told her to come closer, asking repeatedly whether she was afraid of him. At that point it was getting close to the time the rest of the children had to go to school. Julio returned and the children went outside to go to school. Antonio was nearby on the porch.
Defendant told Rocio the children were not going to school. Antonio and Julio told defendant the children needed to go to school and Julio told Sandra, Eric, Sergio, Martin Jr., and Wendy to get in the car. The children got in the car and defendant again yelled that no one was going to school. When Julio asked why, defendant pulled out a gun. Defendant grabbed Rocio around the neck, and pointed a gun at her head.
Julio asked defendant if he wanted Rocio and the children to return with him. *281 Julio pulled Sergio and Martin Jr. out of the car and said "[t]hey're here. If you want to take them, take them." Antonio told defendant to put the gun away because he was scaring the children. Julio stood next to Martin Jr., and told defendant he was scaring the boy. Defendant then shot twice in Julio's direction. Antonio moved to take the gun away, but defendant shot at Antonio. Julio, Antonio, and Sergio ran inside the house. At that moment, Soria drove away from the house, afraid that he would be blamed for whatever was going to happen.
Defendant, still holding on to Rocio with a gun to her head, walked off the porch and went next to the car. He ordered Martin Jr. to the car and told Sandra to get out of the car, telling her he would kill her mom if she did not get out. Defendant then let go of Rocio and grabbed Sandra by her neck, with the gun to her head. Sandra began crying and defendant told her to stop. Defendant told her not to cry because he was going to kill them anyway. Defendant told Rocio to go around to the other side of the car and turn the car around so that it was facing the street. Rocio did so and then got out of the car. Defendant told Sandra, Eric, Wendy, and Martin, Jr., to get in the front seat, which they all did.
Defendant told Rocio to go inside and tell people not to call the police. He told Rocio to tell Antonio that he also had his daughter, Wendy. Defendant said that if the police were called, he would kill the children. Rocio asked defendant if he wanted her to go back home with him, offering to take their biological children and return with him. Defendant replied that it was too late. Defendant ordered Rocio to get his knapsack from the porch and to bring it to him, which she did. Defendant was upset and nervous and said he did not know what would happen next. About three or four minutes passed. Rocio then heard defendant tell Sandra, "Turn around to look at your mother. Look how she is and remember that this is your fault. If you wouldn't have told your mother anything, she would be with me. And now both of you are going to die." He told Sandra not to cry or he would kill Rocio first. Defendant again told Rocio to go inside and to tell everyone not to call the police or else he would kill the children.
Meanwhile, Julio phoned 911 and told dispatch what was happening, warning that the officers needed to be careful because defendant had a gun to Sandra's head. Julio told dispatch the officers could get to his house via a rear street because he was worried about what defendant might do. Nonetheless, despite Julio's warnings, patrol car sirens became audible just as Rocio was entering the house. At that moment, defendant shot Sandra. Defendant then shot the other children. Antonio attempted to go outside, but defendant shot at him. When deputies from the San Bernardino Sheriffs Department arrived, defendant opened fire on them. The officers drew their guns and returned fire, wounding defendant. Defendant attempted to flee, running to the side of the house. Julio, who had been on the line with the 911 operator, dropped the phone and ran after defendant. Defendant and the deputies continued to exchange gunfire. Defendant slipped in some sand and Julio jumped on him and took his gun away. The deputies took defendant into custody.
Rocio ran to see her children. Sandra was lying in a pool of blood. Wendy was lying against the driver's side window. Martin Jr. was under the car. Eric was lying on the ground. Sandra was already dead but Wendy, Eric, and Martin Jr. were still alive. Wendy and Eric died *282 before emergency personnel arrived. Martin Jr. survived.[7]
After they located Soria, the police found in the car a hand-drawn map to Antonio's house on which defendant had written Sandra's name. Defendant had also drawn a swastika and written the words "Mexican power kill."

2. Defense Case
Defendant's version of events largely tracked the prosecutor's, but defendant argued that he lacked the mental state necessary for first degree murder. Defendant called Dr. Jose Moral, a forensic psychiatrist, who testified that Rocio's departure with the children caused defendant to develop a depressive disorder. Dr. Moral testified that someone in that frame of mind would feel humiliated, angry, and out of control if their wish that the children not go to school was overridden. Dr. Moral also testified that the deputies arriving with their sirens activated would have pushed such a person into a crisis state, perhaps rendering that person unable to properly react to the situation. The problem would be exacerbated by the presence of alcohol in one's system.
Defendant also elicited testimony about the response of the deputies to the situation in Landers. Defendant called Frank Saunders, a police practices expert, who testified that the officers responded properly initially, but escalated the situation by confronting defendant.

B. Penalty Phase
The prosecution's case in aggravation consisted of four witnesses: Sergio, Rocio, and Wendy's parents, Antonio and Antonia Cervantes. They described the sense of loss each felt due to the death of their family members.
Defendant's mitigation case consisted of six witnesses. Dr. Joseph Lantz testified about defendant's limited mental functioning and low intellectual ability. He testified that defendant felt overwhelmed as a result of the departure of his family and his intellectual limitations left him unable to cope with the situation in Landers. Three family membersdefendant's father, mother, and half-brotherand two friends testified about defendant's good qualities, his difficult childhood, and their positive feelings for defendant.

II. Discussion

A. Guilt Phase

1. Admission of Sandra's Accusation
Defendant contends the trial court erred when it failed to exclude Rocio's testimony that Sandra accused defendant of sexually molesting her. First, defendant argues Sandra's statements constituted inadmissible hearsay (Evid.Code, § 1200). Second, defendant claims admission of the accusations violated the confrontation clause of the Sixth Amendment to the United States Constitution, as construed by the high court in Crawford v. Washington (2004) 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (Crawford). Third, defendant contends that evidence related to the accusations should have been excluded because its probative value was substantially outweighed by the danger of undue prejudice (Evid.Code, § 352). We disagree.
As previously set forth, after the Carson City Sheriffs deputies arrested defendant for hitting Sandra, she told Rocio defendant had been sexually molesting her for *283 the previous seven to eight months. Rocio took the children and drove to her brother's house in Landers. After defendant was released from jail, he phoned Rocio and she confronted him with Sandra's accusations, which he angrily denied. Defendant and Rocio discussed Sandra's claims in detail during numerous other phone conversations as well. Defendant became depressed, feeling betrayed by Sandra and blaming her in part for Rocio's departure with the children. Before killing Sandra and the other two children on January 25, 1996, defendant told Sandra, "this is your fault. If you wouldn't have told your mother anything, she would be with me. And now both of you are going to die."
On June 10, 1997, the prosecutor stated his intention to offer Sandra's statements as evidence in the guilt and penalty phase. Defense counsel filed a motion in limine to exclude the statements as inadmissible hearsay and highly prejudicial. At a hearing on the motion, the prosecutor argued the evidence did not constitute hearsay because Sandra's statements were not being offered to prove defendant actually molested her, but instead that defendant knew of the accusations and as evidence of his premeditation and motive for driving to Landers to kill Sandra. The trial court agreed that the evidence was not offered for a hearsay purpose.
Defense counsel next argued the court should exclude the evidence under Evidence Code section 352. In defense counsel's view, the evidence had minimal probative value and was simply "icing on the cake" of the prosecutor's case. Additionally, any probative value was outweighed by the significant danger of undue prejudice, given the nature of Sandra's statements. The trial court disagreed and denied defendant's motion, although it stated it would give a limiting instruction.
During the guilt phase, Rocio testified regarding Sandra's accusations and her own detailed communication of those accusations to defendant. Defense counsel objected on hearsay grounds during Rocio's testimony and requested the court instruct the jury not to consider the statements for their truth. The prosecutor responded, "That's fine," and the court stated that it would "so instruct the jury." The court admonished the jury during Rocio's testimony that the statements were not being offered for their truth but rather to explain defendant's conduct. The court also gave similar limiting instructions before the jury began their deliberations.
Counsel also stipulated to the admission of the two incident reports: Deputy Graunke's incident report, which included Sandra's written statement accusing defendant of "touching" her, and Detective Wolfs interview of Deputy Graunke, in which Deputy Graunke stated Sandra denied having been sexually abused by defendant.
During the prosecutor's questioning of the forensic pathologist about the autopsy conducted on Sandra, the prosecutor briefly addressed whether Sandra had been molested. The prosecutor asked if Sandra's body had been examined "to ascertain whether or not there was any evidence that [Sandra] might have been molested." The pathologist testified that he had, but that there was no evidence of molestation. Defense counsel did not object.
During the penalty phase, Sandra's accusations were again discussed, albeit mostly via indirect references. The prosecutor made only a slight reference to it in his closing argument. Rocio briefly alluded to the accusations of sexual abuse on two occasions. Defendant did not object to either the prosecutor's reference or Rocio's testimony. Additionally, the psychologist *284 testifying for the defense, while on direct examination by defense counsel, stated "[w]e know that [defendant] was upset because Sandra had spoken about abuse."
Defendant renewed his objections to the admission of Sandra's statements in his posttrial motion to set aside the verdict. The trial court denied defendant's motion.

a. Hearsay Claim
The Evidence Code defines hearsay as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200.) The trial court concluded the prosecutor was not offering Sandra's statements to prove defendant actually molested her, but rather to prove defendant was aware of the accusations and to explain defendant's motive for killing Sandra. Accordingly, the evidence did not constitute hearsay. We agree.
Sandra's accusations were properly admitted to explain defendant's state of mind, motive, and conduct. (People v. Hill (1992) 3 Cal.4th 959, 987, 13 Cal.Rptr.2d 475, 839 P.2d 984; People v. Duran (1976) 16 Cal.3d 282, 295, 127 Cal.Rptr. 618, 545 P.2d 1322.) Rocio testified that, after Sandra told her about defendant's abuse, she had numerous conversations with defendant during which she confronted him with the details of Sandra's accusations. There is no dispute defendant was aware of the accusations before he went to Landers.
Defendant argues the prosecutor's actual purpose in presenting evidence of Sandra's accusations was to suggest defendant actually molested Sandra. The record does not support defendant's contention. The prosecutor contended defendant's anger about the allegations and their effect on his family led him to murder Sandra and the other children. Indeed, as the prosecutor pointed out in his closing argument in the guilt phase, the veracity of Sandra's accusations was immaterial to their relevance in explaining defendant's motive. "Whether the allegations were true or false, is not for you to consider. That's not what we're here about. He's not being tried for molestation. Sandra is not here to testify about it. So just remember, it's only there to help you understand that he was angry, one way or the other. Either that he did [molest Sandra] and she copped on him, or that he didn't do it and she lied about it, but he was mad at her."[8]
Furthermore, in his guilt phase opening statement, the prosecutor even noted that Sandra had denied being abused to Deputy Graunke and that defendant consistently denied doing so. The prosecutor made clear that the statements were only being offered to explain defendant's conduct because, true or not, "the claim was made, and Rocio was furious about it, and she took the kids while he was in jail and left.... [¶] ... [¶] This disturbed him a great deal. He started thinking about it incessantly about five days before the killings took place."
Accordingly, we conclude the trial court correctly admitted the statements for the limited nonhearsay purpose for which it *285 was offered.[9]

b. Sixth Amendment and Confrontation Clause Claim
Defendant contends the admission of Sandra's statements violated the confrontation clause of the Sixth Amendment. We disagree.
The confrontation clause provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." (U.S. Const., amend.VI.) However, as the high court acknowledged in Crawford, the Sixth Amendment is not implicated by the admission of nonhearsay statements. (Crawford, supra, 541 U.S. at p. 68, 124 S.Ct. 1354; .People v. Combs (2004) 34 Cal.4th 821, 842-843, 22 Cal.Rptr.3d 61, 101 P.3d 1007) The cases defendant cites to the contrary are inapposite as they involve testimonial statements being offered to prove the truth of the statements' content. (See., e.g., Bockting v. Bayer (9th Cir.2005) 399 F.3d 1010; People v. Sisavath (2004) 118 Cal.App.4th 1396, 13 Cal. Rptr.3d 753.) Because we have already concluded Sandra's statements were admitted for a nonhearsay purpose, defendant's claim fails.

c. Evidence Code Section 352 Claim
Defendant contends the trial court erred by admitting evidence of Sandra's statements, arguing the statements should have been excluded pursuant to Evidence Code section 352. We disagree.
It is within a trial court's discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice. (Evid. Code, § 352.) Our review on this issue is deferential. A trial court's decision whether to exclude evidence pursuant to Evidence Code section 352 is reviewed for abuse of discretion. (People v. Barnett (1998) 17 Cal.4th 1044, 1118, 74 Cal. Rptr.2d 121, 954 P.2d 384.)
While it is true that evidence suggesting defendant was not only a murderer but a child molester had the potential to be inflammatory, "it did not amount to `"`evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.'"' [Citations.]" (People v. Barnett, supra, 17 Cal.4th at pp. 1118-1119, 74 Cal.Rptr.2d 121, 954 P.2d 384, italics added.) As discussed above, Sandra's accusations were substantially probative of defendant's premeditation and motive for coming to Landers to kill Sandra. Evidence was presented that, after being confronted with Sandra's accusations, defendant became increasingly angry and distressed, and felt betrayed by Sandra. Several witnesses testified defendant told Sandra right before he killed her that she was to blame for what he was about to do.
By contrast, any prejudice was limited by the instructions given by the trial court. During his examination of Rocio, the prosecutor suggested the court admonish the jury that Sandra's statements were being offered to explain defendant's conduct and not to prove the truth of the matter asserted, *286 and the court did so. At the close of the guilt phase, the court instructed the jury that the "evidence was admitted for a limited purpose" and "could not be considered by you for any purpose other than the limited purpose for which it was admitted." We presume, absent evidence to the contrary, that the jurors faithfully followed these instructions. (People v. Green (1980) 27 Cal.3d 1, 29, 164 Cal.Rptr. 1, 609 P.2d 468.) In addition, any risk of prejudice was further minimized by the prosecutor's repeated underscoring of the point in his guilt phase opening statement and closing argument, as discussed above. Thus, the probative value of the statements was not substantially outweighed by the probability of a substantial danger of undue prejudice.[10] We therefore conclude the trial court did not err in admitting Sandra's statements.

2. Prosecutorial Misconduct
Defendant contends the prosecutor committed repeated acts of prejudicial misconduct requiring reversal of the guilt phase. We disagree. While several of the prosecutor's comments were improper, reversal is not warranted as the misconduct was not prejudicial.
A prosecutor's conduct violates a defendant's constitutional rights when the behavior comprises a pattern of conduct so egregious that it infects "`the trial with unfairness as to make the resulting conviction a denial of due process.' [Citation.]" (Darden v. Wainwright (1986) 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144.) The focus of the inquiry is on the effect of the prosecutor's action on the defendant, not on the intent or bad faith of the prosecutor. (People v. Crew (2003) 31 Cal.4th 822, 839, 3 Cal.Rptr.3d 733, 74 P.3d 820.) Conduct that does not render a trial fundamentally unfair is error under state law only when it involves "`"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."' [Citations.]" (People v. Espinoza (1992) 3 Cal.4th 806, 820, 12 Cal.Rptr.2d 682, 838 P.2d 204.)

a. Examination of Deputy Gordon
Defendant argues that the prosecutor committed misconduct by making disparaging remarks about defense counsel and defense evidence. (See People v. Bemore (2000) 22 Cal.4th 809, 846, 94 Cal. Rptr.2d 840, 996 P.2d 1152.) The first cited example occurred during the prosecutor's examination of Deputy Stan Gordon. Discussing defendant's theory that the deputies' response to Antonio's house exacerbated the crisis, the prosecutor asked the deputy whether that theory had been raised in Soria's prior trial.[11] When the deputy testified that it had not, the prosecutor stated "[i]n other words, that defense attorney didn't try to blame the cops for this?" Defense counsel objected, stating "[e]xcuse me, counsel has tried to disparage the defense a number of times. I would like an order that he knock it off." The prosecutor retorted "It takes a big *287 man to admit he's wrong." The trial court intervened, sustaining defendant's objection and admonishing the jury not to draw any inferences from the prosecutor's question or comments.
While it is misconduct for a prosecutor to cast aspersions on defense counsel or suggest that counsel has fabricated a defense, we need not resolve whether the prosecutor's comment was improper. In the present case, the trial court sustained the defense objections and admonished the jury to disregard the comments; it is assumed the jury followed the admonishment and that prejudice was therefore avoided. (People v. Jones (1997) 15 Cal.4th 119, 168, 61 Cal.Rptr.2d 386, 931 P.2d 960.)
Later in the direct examination of Deputy Gordon, the prosecutor asked the deputy whether he had turned on his belt recorder during the incident and, when the deputy responded that he had, the prosecutor indicated his desire to play the recording and to question the deputy about it. Defense counsel stated "[y]our honor, I don't know if there's something that this witness needs his memory refreshed by listening to the recorder. Perhaps [the prosecutor] could ask him the questions first, and if he doesn't remember, then he might have to refresh his recollection." The prosecutor responded "[c]lever objection, but it's not the point. He has to authenticate the voices on the tape, and he has to hear them before he can do that." The court overruled the objection.
Defendant's claim that the prosecutor's sarcastic retort constituted misconduct is forfeited by his failure to timely object on that ground and request the court admonish the jury. (People v. Ayala (2000) 23 Cal.4th 225, 284, 96 Cal. Rptr.2d 682, 1 P.3d 3; In re Sheena K. (2007) 40 Cal.4th 875, 880, fn. 1, 55 Cal. Rptr.3d 716, 153 P.3d 282.) "Additionally, when the claim [of misconduct] focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (People v. Ayala, supra, at p. 284, 96 Cal.Rptr.2d 682, 1 P.3d 3.) While the prosecutor's statement that counsel had made a "clever objection" may have been needlessly sarcastic, it did not constitute misconduct.

b. Examination of Defense Psychiatrist
The next alleged example of misconduct occurred during the prosecutor's cross-examination of defense psychiatrist Dr. Jose Moral. Defendant contends the prosecutor committed misconduct when he mentioned defendant's prior arrests without first seeking the court's permission. Dr. Moral testified about defendant's anger issues, stating that defendant did not believe he had an anger issue prior to hitting Sandra. The prosecutor then mentioned defendant's arrest in 1986 for battery and in 1993 for discharging a firearm, asking Dr. Moral whether the arrests would have put defendant on notice that he had prior problems with anger and alcohol. Defendant objected and there was a discussion at sidebar. After the discussion, during which the prosecutor stated that he believed his examination complied with the trial court's rulings, the trial court stated it would sustain defendant's objection and instruct the jury to disregard the last questions and statements.
When defendant's objections are sustained and the court admonishes the jury to disregard the improper comments, we assume the jury will follow the admonishment and any prejudice is avoided. (People v. Jones, supra., 15 Cal.4th at p. 168, 61 Cal.Rptr.2d 386, 931 P.2d 960.) Accordingly, *288 we need not decide whether the prosecutor committed misconduct.

c. Prosecutor's Closing Argument
Defendant next focuses on the prosecutor's closing argument. The prosecutor, discussing whether manslaughter would be appropriate, turned to the notion of an "ordinarily reasonable person." "And who is the ordinarily reasonable person? You folks are." Defendant objected and sought an admonition, explaining "that is an incorrect statement of the law. The jury is not to put themselves in as a reasonable person." The trial court told the jury "[t]he Court's instructions are what you are to follow in this case, not what counsel argues."
Moments later the prosecutor continued, "this is a situation where again you have to impose the reasonable person standard. It's not what Mr. Mendoza may have felt, or what he may have gone through. He's not entitled to set up his own standard of conduct. Can you imagine a society that allowed us to do that? Would any of you do what he did here and say that's reasonable? Would any of you do that? No. Would any of you put a gun to people's heads? Would any of you do what he did here? Is that reasonable?" Defendant objected and the court admonished the jury that "the standard is the ordinarily prudent person, which is an objective test, not an individual's personal beliefs, but an objective test of what you think an ordinarily prudent, reasonable person would do or not do."
Although counsel have "broad discretion in discussing the legal and factual merits of a case [citation], it is improper to misstate the law. [Citation.]" (People v. Bell (1989) 49 Cal.3d 502, 538, 262 Cal. Rptr. 1, 778 P.2d 129.) Here, the prosecutor misstated the law when he told the jurors that they, as individuals, could subjectively define the reasonable person standard. The "reasonable person" is a hypothetical individual who is intended to represent a sort of "average" citizen. Therefore, it is one thing to refer to the jurors as members of society in the course of explaining the reasonable person standard as a means of determining whether a killing was caused by an event or situation that probably would cause a reasonable person to lose self-control and kill. Accordingly, it was not misconduct for the prosecutor to tell the jury "And who is the ordinarily reasonable person? You folks are." It is another thing, however, to imply that the jurors, as individuals, can substitute their own subjective standard of behavior for that of the objective, reasonable person. Statements such as, "Would any of you do what he did here and say that's reasonable? Would any of you do that? No. Would any of you put a gun to people's heads? Would any of you do what he did here?" appear to encourage jurors to impose their own subjective judgment in place of applying an objective standard. It is here that the prosecutor went too far, committing misconduct.
However, arguments of counsel "generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence [citation], and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law." (Boyde v. California (1990) 494 U.S. 370, 384, 110 S.Ct. 1190, 108 L.Ed.2d 316.) The prosecutor's misconduct was not prejudicial. The trial court admonished the jury (People v. Jones, supra, 15 Cal.4th at p. 168, 61 Cal.Rptr.2d 386, 931 P.2d 960) and gave them the correct standard, and the jury understood that the prosecutor's statements merely constituted argument.
*289 Defendant next argues that the prosecutor injected his own feelings during closing argument. As the prosecutor argued, "Who can forget the very chilling testimony of little Sergio when he talks about how his father was holding the gun to people's head and saying he was gonna kill mom if he didn'tif Sandra didn't stop crying. How outrageous is that? Is that the act of a reasonable person? Shut up, stop crying, or I'm gonna kill your mom. I don't know about you, I'm an old war horse. I've been through a lot of these. That choked me up when I saw that testimony." Defense counsel asked to approach the bench and, at sidebar, asked for a finding of prosecutorial misconduct and for a mistrial. Defense counsel argued that the prosecutor improperly injected his personal opinion into closing argument and that it was only the most recent example of a pattern of prosecutorial misconduct.
The court denied the motion, but stated that it would "caution [the prosecutor], I do agree this last comment was probably not appropriate, your personal feelings about, about this. This is probably inappropriate, but I don't think it rises to the level of a mistrial. The other problem you mentioned with the standard, the Court admonished the jury, and has instructed them, and I think that problem is corrected. In any event, I will deny the motion but with that admonition to [the prosecutor]."
The prosecutor improperly stated his personal beliefs (e.g., "I don't know about you, I'm an old war horse. I've been through a lot of these. That choked me up when I saw that testimony") based on facts not in evidence. (People v. Ghent (1987) 43 Cal.3d 739, 772, 239 Cal.Rptr. 82, 739 P.2d 1250.) In underscoring the egregiousness of defendant's crimes, the prosecutor emphasized his long experience as a basis for assessing Sergio's testimony. This constituted misconduct. (People v. Bandhauer (1967) 66 Cal.2d 524, 529-530, 58 Cal.Rptr. 332, 426 P.2d 900.) However, the trial court found the statement did not warrant a mistrial, a decision which is within the sound discretion of the trial court. (People v. Price (1991) 1 Cal.4th 324, 430, 3 Cal.Rptr.2d 106, 821 P.2d 610.) The prosecutor's reference to his own feelings was brief and, after the trial court's ruling, the prosecutor did not return to the point. Moreover, the prosecutor's statements were part of his argument and likely given less weight than instructions given by the court. (Boyde v. California, supra, 494 U.S. at p. 384,110 S.Ct. 1190.)
Defendant next argues the prosecutor committed misconduct when it asked the jury to place themselves into the shoes of the victims. "Do you remember the thing he said to litcle Sandra just before he executed her with a gun at her head? Can you imagine the terror that this child is going through, and that all the people are going through? Certainly the children. Can you imagine that terror? It's not in the courtroom. We're not here doing some scientific experiment. Imagine yourselves at the scene. And what does he do?"
Defense counsel asked to approach the bench, and at sidebar again asked for a mistrial and a finding of prosecutorial misconduct. Defense counsel argued that the prosecutor was improperly attempting to incite the passions of the jury by asking them to place themselves at the scene and to imagine the victims' terror. The court denied the motion for a mistrial, telling the prosecutor to "move off that subject and move on with your argument."
In the guilt phase of a trial, it is misconduct to appeal to the jury to view the crime through the eyes of the victim. (People v. Stansbury (1993) 4 Cal.4th 1017, 1057, 17 Cal.Rptr.2d 174, 846 P.2d 756.) *290 Here, the prosecutor's request that the jury imagine the fear defendant's victims experienced was clearly improper. However, the misconduct was not prejudicial as his comments were brief and he did not return to the point. Moreover, this was not a close case; evidence of defendant's guilt was overwhelming. Accordingly, the trial court did not abuse its discretion in denying defendant's request for a mistrial. (People v. Price, supra, 1 Cal.4th at p. 430, 3 Cal.Rptr.2d 106, 821 P.2d 610.)

d. Cumulative Effect of Prosecutorial Misconduct
Defendant contends the numerous instances of alleged prosecutorial misconduct rendered his trial fundamentally unfair, in violation of his federal constitutional right to due process and a reliable verdict. We disagree. Although our review has uncovered several instances of misconduct, as discussed above, the incidents were not prejudicial.
In a number of instances, defendant failed to object or request an admonition and so forfeited the claim. (People v. Ayala, supra, 23 Cal.4th at p. 284, 96 Cal. Rptr.2d 682, 1 P.3d 3; In re Sheena K, supra, 40 Cal.4th at p. 880, fn. 1, 55 Cal. Rptr.3d 716, 153 P.3d 282.) In all other instances, the trial court sustained defense objections and admonished the jury. (People v. Jones, supra, 15 Cal.4th at p. 168, 61 Cal.Rptr.2d 386, 931 P.2d 960.) Additionally, this was not a close case. As we have repeatedly noted, it is undisputed that defendant shot and killed three children, including his two stepchildren. There was also substantial evidence of defendant's premeditation, including his purchase of ammunition, his statements to Soria, and his statements to Rocio and Sandra in Landers. We therefore reject defendant's claim of prejudicial misconduct, (People v. Hinton (2006) 37 Cal.4th 839, 872, 38 Cal. Rptr.3d 149,126 P.3d 981.)

3. Cumulative Effect of Court Error and Prosecutorial Misconduct
Defendant contends the cumulative prejudicial effect of the various trial court errors and prosecutorial misconduct he has raised on appeal requires reversal of the guilt judgment. We have rejected his claims of error, with limited exceptions in which we found the instances of prosecutorial misconduct to be harmless. Considered together, any errors were not prejudicial.

B. Penalty Phase

1. Prosecutorial Misconduct
Defendant contends the prosecutor committed prejudicial misconduct during his penalty phase closing argument. We disagree.
In discussing the evidence that could be considered as part of section 190.3, factor (a),[12] the prosecutor identified the victim impact testimony presented. In discussing the families' suffering, the prosecutor made two additional comments about other "victims." The prosecutor first stated "[w]hen a child is murdered, we all suffer. We have all been made victims, haven't we?" He then told the jury "[y]ou are victims in the sense that you have to make a decision as to whether or not somebody lives or dies." Defense counsel asked to approach the bench.
At sidebar, defense counsel asked the trial court to find the prosecutor had committed misconduct by telling the jurors to consider themselves victims of defendant. *291 Defense counsel requested the trial court read a curative instruction counsel had prepared. The trial court agreed the prosecutor had erred, at which point the prosecutor offered to withdraw the comment and the court stated it would admonish the jury to disregard the statements. The trial court declined defense counsel's invitation to read its curative instruction and instead gave its own admonition. In open court, the court admonished the jury that "the Court advises you that it was not proper for the district attorney to refer to you as victims in this case, and you are to disregard that statement. It's not to enter into your consideration in any way."
As to the prosecutor's argument that the murders victimized everyone ("[w]hen a child is murdered, we all suffer. We have all been made victims, haven't we?"), no misconduct occurred. (See Payne v. Tennessee (1991) 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 [noting that a victim's "`death represents a unique loss to society'"].) As to the prosecutor's second argument that the jurors were themselves victims of defendant because they had to act as jurors ("[y]ou are victims in the sense that you have to make a decision as to whether or not somebody lives or dies"), as the trial court found, the comments constituted misconduct. However, the incident was not prejudicial. The trial court immediately admonished the jury to disregard the statements, specifically chastising the prosecutor. (People v. Jones, supra, 15 Cal.4th at p. 168, 61 Cal. Rptr.2d 386, 931 P.2d 960.)
As above (ante, 68 Cal.Rptr.3d at 290, 171 P.3d at 15), we reject defendant's claim that the cumulative effect of prosecutorial misconduct warrants reversal.
2. Constitutionality of Death Penalty Statute and Instructions
Defendant challenges a number of California's death penalty provisions as unconstitutional. He acknowledges we have repeatedly rejected these claims in previous decisions but argues we should reconsider our holdings. Having found no reason to do so, we reject these claims without extensive discussion.
Defendant contends that the lack of intercase proportionality review for death penalty cases is unconstitutional. This court has repeatedly held that proportionality review in such circumstances is not required. (People v. Williams (2006) 40 Cal.4th 287, 338, 52 Cal.Rptr.3d 268, 148 P.3d 47; People v. Anderson (2001) 25 Cal.4th 543, 602, 106 Cal.Rptr.2d 575, 22 P.3d 347; see Pulley v. Harris (1984) 465 U.S. 37, 50-51, 104 S.Ct. 871, 79 L.Ed.2d 29.)
Defendant contends that the jury should have been required to find all aggravating factors beyond a reasonable doubt, that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt, and that death is the appropriate penalty beyond a reasonable doubt before imposing the death penalty. We have repeatedly rejected such claims. (People v. Bell (2007) 40 Cal.4th 582, 620, 54 Cal.Rptr.3d 453, 151 P.3d 292; People v. Avila (2006) 38 Cal.4th 491, 614-615, 43 Cal.Rptr.3d 1, 133 P.3d 1076; People v. Snow (2003) 30 Cal.4th 43, 126, 132 Cal. Rptr.2d 271, 65 P.3d 749.) Defendant argues our holdings are no longer tenable in light of Apprendi v. New Jersey (2000) 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435, Ring v. Arizona (2002) 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556, and Blakely v. Washington (2004) 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403. We have repeatedly held that the high court's recent decisions do not compel a different answer. (People v. Bell, supra, 40 Cal.4th at p. 620, 54 Cal.Rptr.3d 453, 151 P.3d 292; People *292 v. Rogers (2006) 39 Cal.4th 826, 893, 48 Cal.Rptr.3d 1, 141 P.3d 135; People v. Morrison (2004) 34 Cal.4th 698, 730-731, 21 Cal.Rptr.3d 682,101 P.3d 568.)
Defendant argues that the failure to assign the state any burden of persuasion renders unconstitutional California's death penalty provisions. We disagree as we have previously held that the appropriateness of a death sentence is not subject to a burden-of-proof qualification. (People v. Elliot (2005) 37 Cal.4th 453, 487-488, 35 Cal.Rptr.3d 759,122 P.3d 968.)
Defendant further contends that jurors are constitutionally required to unanimously agree on which factor it finds in aggravation. We have rejected this argument on numerous occasions. (People v. Williams, supra, 40 Cal.4th at p. 338, 52 Cal.Rptr.3d 268, 148 P.3d 47; People v. Morrison, supra, 34 Cal.4th at pp. 730-731, 21 Cal.Rptr.3d 682, 101 P.3d 568.)
Defendant argues that the penalty jury should have been instructed that the presumption at the penalty phase is a life sentence. We disagree, noting that we have previously held that the argument lacks merit. (People v. Arias (1996) 13. Cal.4th 92, 190, 51 Cal.Rptr.2d 770, 913 P.2d 980.)
Defendant contends CALJIC No. 8.88 is unconstitutional. CALJIC No. 8.88 instructs the jurors that, to impose the death penalty, they "must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." We disagree. We have rejected claims that the "so substantial" language is impermissibly vague and ambiguous. (People v. Boyette (2002) 29 Cal.4th 381, 494-465, 127 Cal.Rptr.2d 544, 58 P.3d 391.) We have similarly rejected claims that the instruction is unconstitutional because it refers to whether the death penalty is "warranted" instead of "appropriate." (People v. Perry (2006) 38 Cal.4th 302, 320, 42 Cal.Rptr.3d 30, 132 P.3d 235.) Defendant also argues the instruction fails to convey that a life sentence is mandatory if mitigating factors outweigh aggravating factors. We disagree. As we have previously held, the instruction does not permit the death penalty to be imposed if aggravation fails to outweigh mitigation. (Ibid.) We have also rejected claims that the instruction impermissibly failed to inform the jurors of the absence of a burden of proof. (People v. Cornwell (2005) 37 Cal.4th 50, 104, 33 Cal. Rptr.3d 1,117 P.3d 622.)
Defendant also argues that the instructions regarding the mitigating and aggravating factors in Penal Code section 190.3 and their application render defendant's death sentence unconstitutional. We disagree. Section 190.3, factor (a) is not so vague as to result in the arbitrary and capricious imposition of the death penalty. (Tuilaepa v. California (1994) 512 U.S. 967, 976, 114 S.Ct. 2630, 129 L.Ed.2d 750; People v. Brown (2004) 33 Cal.4th 382, 401, 15 Cal.Rptr.3d 624, 93 P.3d 244.) CALJIC No. 8.85 instructs the jury on factors to be considered during the penalty phase. A trial court's failure to delete inapplicable sentencing factors does not violate a defendant's constitutional rights. (People v. Maury (2003) 30 Cal.4th 342, 439-440, 133 Cal.Rptr.2d 561, 68 P.3d 1.) A defendant's rights are not violated by the failure to inform the jury that the mitigating factors are relevant solely in mitigation. (People v. Brown, supra, 33 Cal.4th at p. 402, 15 Cal.Rptr.3d 624, 93 P.3d 244; Tuilaepa v. California, supra, 512 U.S. at p. 979, 114 S.Ct. 2630.) CALJIC No. 8.85, factor (d) asks whether the crime was committed "while the defendant was under the influence of extreme mental or emotional disturbance," and factor (g) asks whether the *293 defendant "acted under extreme duress or under the substantial domination of another person." Defendant argues that the use of adjectives such as "extreme" and "substantial" in these factors impedes the jury's consideration of mitigation factors. We disagree. (People v. Elliot, supra, 37 Cal.4th at p. 488, 35 Cal.Rptr.3d 759, 122 P.3d 968.) We also reject defendant's claim that written findings by the jury are constitutionally required. (Ibid.)
Defendant argues California's use of the death penalty as a regular form of punishment violates international law, a contention we have repeatedly rejected. (People v. Elliot, supra, 37 Cal.4th at p. 488, 35 Cal.Rptr.3d 759, 122 P.3d 968.) Nor does it violate international norms of humanity and decency. (People v. Panah (2005) 35 Cal.4th 395, 500-501, 25 Cal. Rptr.3d 672, 107 P.3d 790.) Thus, contrary to defendant's argument, the death penalty does not violate the Eighth and Fourteenth Amendments to the United States Constitution. (People v. Blair (2005) 36 Cal.4th 686, 754-755, 31 Cal. Rptr.3d 485,115 P.3d 1145.)

3. Cumulative Effect of Court Error and Prosecutorial Misconduct
Defendant contends the cumulative prejudicial effect of the various trial court errors and prosecutorial misconduct he has raised on appeal requires reversal of the penalty judgment. We have rejected his claims of error, with the limited exception of an instance of prosecutorial misconduct which we found to be harmless. Considered together, any errors were not prejudicial.

C. Vienna Convention on Consular Rights and the Avena Judgment
Defendant contends his rights under the Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77 (Vienna Convention), were violated during pretrial and trial proceedings in this case, requiring the reversal of his death sentence. We disagree.

1. Legal Background
Article 36, paragraph 1(b), of the Vienna Convention provides that law enforcement officials "shall inform" arrested foreign nationals of their right to have their consulate notified of their arrest, and if a national so requests, inform the consular post that the national is under arrest. Article I of the Optional Protocol Concerning the Compulsory Settlement of Disputes, April 24, 1963, 21 U.S.T. 325 (Optional Protocol), provides that disputes "arising out of the interpretation or application of the [Vienna Convention] shall lie within the compulsory jurisdiction of the International Court of Justice...." The United States, upon the advice and consent of the Senate, ratified both instruments in 1969. (Vienna Convention, supra, 21 U.S.T., at p. 79.)[13]
On January 9, 2003, the Government of Mexico initiated proceedings in the International Court of Justice (ICJ) against the United States, alleging violations of the Vienna Convention in the cases of defendant and 53 other Mexican nationals who had been sentenced to death in state criminal proceedings in the United States. (Application Instituting Proceedings (Mex. v. U.S.), 2003 I.C.J. 128 (Case Concerning Avena and Other Mexican Nationals) (Jan. 9, 2003).) After both Mexico and the United States filed briefs and evidence, the ICJ held a hearing and then issued its *294 judgment. (Case Concerning Avena and other Mexican Nationals (Mex. v. U.S.), 2004 I.C.J. 128 (Judg. of Mar. 31, 2004) (Avena).)
The ICJ held that the United States had breached article 36, paragraph 1(b) of the Vienna Convention in the cases of 51 of the Mexican nationals, including defendant, by "failing to inform detained Mexican nationals of their rights under that paragraph" and "to notify the Mexican consular post of the detention." (Avena, supra, 2004 I.C.J. 128, pars. 106(l)-(2), 153(4).) The ICJ further held that in 49 cases, including defendant's, the United States had breached its obligation under article 36, paragraph 1(a), "to enable Mexican consular officers to communicate with and have access to their nationals, as well as its obligation under paragraph 1(c) of that article regarding the right of consular officers to visit their detained nationals." (Avena, supra, pars. 106(3), 153(5-6).)
Addressing the remedy for the violation, the ICJ denied Mexico's request that the convictions and sentences be annulled (Avena, supra, 2004 I.C.J. 128, par. 123), but held United States courts must provide review and reconsideration of the convictions and sentences "with a view to ascertaining whether ... the violation ... caused actual prejudice to the defendant...." (Id., par. 121; pars. 122, 153(9).) The ICJ further held that courts could not rely on procedural default rules as a basis for declining to consider defendants' claims, lest the courts prevent "full effect [be] given to the purposes" of article 36. (Avena, supra, par. 113; contra Sanchez-Llamas, supra, 126 S.Ct. at pp. 2682-2687 (concluding that procedural default rules may be applied to art. 36 claims).)
On February 28, 2005, after the decision in Avena was issued, President George W. Bush issued a memorandum to the United States Attorney General, stating that the United States would discharge its obligations under that decision "by having State courts give effect to the decision in accordance with general principles of comity in cases filed by the 51 Mexican nationals addressed in that decision." [14]

2. Relevant Proceedings in Defendant's Case
Defendant asserts that his death sentence should be set aside based on a violation of the Vienna Convention. We disagree.
On December 22, 1997, after he had been convicted and sentenced to death by the jury, defendant filed a motion for a new trial. Nowhere in the motion did defendant raise a claim that the Vienna Convention had been violated. On the same day, defendant filed a letter from the Mexican Coordinator General of Protection and Consular Matters, at the consul's behest. The letter conveyed the Mexican government's "request of clemency," asking the trial court to take into account certain factors "to mitigate the judicial resolution." One of the factors was that defendant "was not informed of his right to make contact with his consulate" in violation of the Vienna Convention.
The letter contended that the failure to do so "made it impossible for [defendant] to receive the protection and assistance of the Consulate from the moment in which he was apprehended." Assistance at that point, according to the consulate, "would have guaranteed, among other things, that *295 the arrestee was aware of in his own language and in an accessible fashion, his constitutional and legal rights in the country where he was apprehended, that he be provided which prompt appropriate legal assistance, that he know the possible legal consequences (the application of the death penalty) of the crime of which he was accused; that [sic ] how the legal system of the country where he was detained would be explained to him." The letter did not contend, much less establish, that defendant had been denied any of the things the consulate says it would have provided.
On December 23, 1997, the trial court held a hearing on defendant's motion for a new trial. After the prosecutor addressed defendant's motion, defense counsel told the court that representatives from the Mexican consulate were present and wanted to address "the concerns that the government of Mexico has with the potential sentence in this case." The trial court stated that it wanted to first resolve defendant's motion for a new trial before hearing from the Mexican representatives.
After the trial court denied defendant's motion for a new trial, the court moved on to the automatic motion to modify the death judgment (§ 190.4, subd. (e)), at which point the court invited the consular representative to speak. Raul Cardenas, the Consul of Mexico in San Bernardino, spoke, essentially reiterating portions of the letter, requesting clemency for defendant. Neither Cardenas nor defense counsel argued that the alleged violation denied defendant any benefit he would have otherwise received had the consulate been properly notified. The trial court did not address the issue when it denied the motion to modify the sentence, nor did defense counsel press the court to address the issue.
Even if we assume defendant's consular rights were violated, defendant has failed to demonstrate that he suffered any prejudice as a result. (Avena, supra, pars. 121, 122.) While the letter from the Mexican consulate discusses the assistance it asserts it would have provided had it been notified, the letter did not claim that defendant did not obtain that assistance from other sources. Nor does the record reveal any prejudice. Whether defendant can establish prejudice based on facts outside of the record is a matter for a habeas corpus petition. (People v. Seaton (2001) 26 Cal.4th 598, 643, 110 Cal.Rptr.2d 441, 28 P.3d 175.) Defendant essentially acknowledges that his claim is appropriately raised in such a petition.

III. Disposition
The judgment is affirmed in its entirety.
GEORGE, C.J., KENNARD, BAXTER, WERDEGAR, CHIN and CORRIGAN, JJ., concur.
NOTES
[1] All further unlabeled statutory references are to the Penal Code.
[2] Former section 12022.5 was repealed and replaced by a new section 12022.5 addressing the same subject matter. (Stats.2002, ch. 126, § 3.)
[3] Carson City, Nevada is a consolidated municipality, and police services are provided by the Carson City Sheriffs Office.
[4] While investigating the murders, Detectives Cavenaugh and Wolf from the San Bernardino Sheriff's Department interviewed Deputy Graunke on February 2, 1996 about the January incident. In his interview report, Wolf wrote that "Deputy Graunke asked Sandra if she was fondled or sexually abused by her father. Sandra said there was no sexual abuse; her father hit her and she did not feel comfortable."
[5] At trial, there was some dispute over the timing of when Rocio informed defendant of Sandra's statements. However, it was undisputed that Rocio related the statements to defendant before he later drove from Carson City to Landers to pursue his family.
[6] Soria was tried separately of these same charges and was found not guilty on all counts.
[7] The jury was unable to reach a verdict on count four, which charged defendant with the attempted murder of Martin Jr.
[8] Defendant claims the prosecutor's examination of the forensic pathologist, during which the prosecutor asked whether the autopsy had revealed any evidence of molestation, is evidence that the prosecutor sought to prove Sandra's accusations were true. However, the examination on this point was brief and only resulted in testimony that there was no evidence of molestation. This exchange does not establish that the prosecutor's purpose was to prove the accusations true.
[9] Our conclusion is the same with regard to the penalty phase. The court gave a limiting instruction, again telling the jury that the molestation accusations were not being admitted for their truth. In discussing that instruction in his closing argument, the prosecutor reiterated that the statements were only offered to explain defendant's conduct. Defense counsel elicited similar testimony when he examined defendant's psychologist. Accordingly, we conclude that the references to the accusations during the penalty phase were for a nonhearsay purpose and did not constitute error.
[10] As before (ante, 68 Cal.Rptr.3d at 285, 171 P.3d at 11 fn. 9), our conclusion is the same with regard to the references to the accusations at the penalty phase. The statements were highly probative of defendant's premeditation and intent. Additionally, the court and the prosecutor reminded the jury that the statements were being offered to explain defendant's conduct rather than for their truth. Moreover, defense counsel himself elicited testimony from his own witness regarding defendant's being upset by Sandra's accusations.
[11] As discussed previously (ante, 68 Cal. Rptr.3d at 280, 171 P.3d at 7, fn. 6), defendant's nephew was tried separately but was acquitted of all charges.
[12] Section 190.3, factor (a), allows the trier of fact to take into account: "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1."
[13] The United States gave notice of its withdrawal from the Optional Protocol on March 7, 2005. (Sanchez-Llamas v. Oregon (2006) ___ U.S. ___, 126 S.Ct. 2669, 2675, 165 L.Ed.2d 557 (Sanchez-Llamas).)
[14] The effect of Avena and the President's memorandum is currently pending before the high court. (Ex Parte Medellin (Tex.Crim. App.2006) 223 S.W.3d 315, cert, granted Apr. 30, 2007, sub nom. Medellin v. Texas, No. 06-984, ___ U.S. ___, 127 S.Ct. 2129, 167 L.Ed.2d 862.)