Filed 4/22/14  P. v. Dancy CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>PAUL DANCY,<br><br>        Defendant and Appellant. | E056609<br><br>(Super.Ct.No. FSB703006)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  R. Glenn Yabuno, Judge.  Affirmed.

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

1

## I. INTRODUCTION

A jury convicted defendant Paul Dancy of one count of shooting at an occupied vehicle (Penal Code,[1] § 246, count 2), two counts of assault with a semiautomatic firearm (§ 245, subd. (b), counts 3 and 4), and one count of being a felon in possession of a firearm (former § 12021, subd. (a)(1), count 5). The jury further found that defendant personally used a firearm in committing the assaults (former § 12022.5, subds. (a) & (d)). The jury could not come to a unanimous verdict on a count of first degree murder (§ 187, subd. (a), count 1) and an enhancement of count 2 for personally discharging a firearm and causing great bodily injury or death (former § 12022.53, subd. (d)); the court declared a mistrial on those charges.

On retrial, a second jury convicted defendant of first degree murder (§ 187, subd, (a)) and found true an enhancement of that conviction for personally discharging a firearm, causing great bodily injury or death (former § 12022.53, subd. (d)). Defendant waived jury trial on an enhancement for personally discharging a firearm causing great bodily injury or death (former § 12022.53, subd. (d)) with respect to defendant's conviction on count 2 in the first trial, shooting at an occupied vehicle; after the jury's verdict in the second trial, the court found the enhancement true.

The court imposed sentence for both trials after the second trial. Defendant received an indeterminate term of 75 years to life, plus a determinate term of 33 years four months.

---

[1] All further statutory references will be to the Penal Code unless otherwise noted.

Defendant contends on appeal that he received ineffective assistance of counsel at his first trial, because his counsel did not request a "pinpoint" instruction regarding third party culpability. He further contends the prosecutor committed misconduct at his second trial by misstating the law on aiding and abetting during closing argument. To the extent his prosecutorial misconduct claim was forfeited for failure to object at trial, he argues that failure constitutes a second basis for finding ineffective assistance of counsel. We affirm.

## II. FACTS AND PROCEDURAL BACKGROUND

On August 2, 2007, at about 2:30 p.m., Darrin Parris was driving his car in the right lane of a street in the City of San Bernardino, with his girlfriend (victim 2) in the front passenger seat and their three-year-old son (victim 3) in the rear passenger seat. A car in the left lane pulled up next to Mr. Parris's car and, after a brief verbal exchange between the two drivers, at least seven shots from a semiautomatic handgun were fired from the car in the left lane at Mr. Parris's car. Three bullets struck Mr. Parris, one fatally. Victims 2 and 3 escaped with only minor cuts from broken glass.

Defendant testified that he was driving the car from which shots were fired.[2] He admitted that he had initiated a verbal confrontation with Mr. Parris prior to any shots being fired by honking his horn, gesturing with his hands, and shouting a challenge for Mr. Parris to pull over and fight. The two men had been in a verbal confrontation

_____

[2] Defendant testified in person at his first trial; by stipulation that testimony was read into the record at his second trial.

3

previously, at a fish fry in July 2007, and the incident on August 2, 2007, was an episode in that ongoing conflict. Defendant denied, however, that he fired a gun at Mr. Parris. According to defendant, Mr. Parris responded to his challenge by saying "you already know I ain't doing no fighting," and making a motion like he was reaching under the seat of his car. Defendant testified that his front seat passenger—someone defendant barely knew, named "Demetri" and nicknamed "Meech"—then unexpectedly pulled out a gun and began firing. Defendant said that, in response to his surprised query, Meech said that it had looked like Mr. Parris was reaching for a gun.[3]

According to defendant, Meech got out of the car a short time later, and defendant never saw him again. Defendant and his brother, Martess Dancy, flew to North Carolina the next morning using one-way tickets booked a few hours after the shooting. Defendant was eventually arrested in Arizona, where he was living under an assumed name. Defendant explained that Mr. Parris had adult sons he believed to be gang members, and he was afraid for his safety and the safety of his family after the shooting.

The prosecution disagreed with defendant's account of the shooting, introducing evidence at both trials that defendant had personally fired the shots that killed Mr. Parris. Victim 2, who had known defendant and his family for many years, testified that she saw defendant drive up beside them, challenge Mr. Parris, and then, while driving, reach

---

[3] A gunshot residue kit indicated that Mr. Parris had not shot a gun immediately prior to his death, and no guns were found in his car or on his person after the shooting.

across the passenger compartment to aim and fire a handgun at them.[4]  She told police the same information immediately after the shooting.  A bystander who witnessed the shooting testified that she observed the driver of the vehicle in the left lane shooting at the vehicle in the right lane.  Additionally, at defendant's first trial, a police detective opined that the physical evidence gathered at the scene was consistent with a driver firing a semiautomatic handgun while reaching across the passenger compartment, rather than a passenger shooting out the passenger-side window.  Statements by victim 3 to victim 2 implicating defendant as the shooter, made during breaks in a recorded police interview of victim 2 shortly after the shooting, were introduced into evidence only at defendant's second trial.[5]

The prosecution also introduced evidence that it was not "Meech," but rather defendant's brother Martess who was defendant's passenger at the time of the shooting. Victim 2 positively identified Martess as defendant's passenger at the time of the shooting.  Martess accompanied defendant on the flight to North Carolina the morning

---

[4]  At defendant's first trial, victim 2 said only that she had known defendant and his brother for about 15 years, since she moved into the same neighborhood.  At defendant's second trial, victim 2 specified that she had dated defendant off and on for "years," that she had known defendant's brother Martess as a "friend of the family," and that her mother and defendant's mother remain friends.

[5]  Victim 3, who knew defendant by name at the time of the shooting, was recorded telling his mother, victim 2, "'My dad got shot.  Paul shot my daddy.  I don't like Paul.'" and "'Paul shoot my daddy.  Paul was like boom, boom, boom, boom, shoots you my daddy.'"  At defendant's first trial, the video of the interview was played for the jury, but victim 3's statements were edited out of the version shown to the jury.  At the second trial, victim 3's statements were introduced through the testimony of the interviewing police officer.

5

after the shooting. In addition, at defendant's second trial, a police investigator testified that his attempt to locate and identify a person named "Demetri" and nicknamed "Meech" (or a variant spelling of that moniker) revealed only one person, who was incarcerated on August 2, 2007.

In defendant's first trial, the prosecution rested its case entirely on the theory that defendant was the shooter, not his passenger (no matter who that passenger might have been). The jury was not instructed on the law of aiding and abetting, and the prosecution explicitly disclaimed any reliance on such a theory to the jury.

In defendant's second trial, the prosecution continued to argue that defendant was the shooter as its primary theory of the case. But the prosecution also asked, in the alternative, for the jury to find defendant guilty on an aiding and abetting theory if it believed defendant's passenger was the shooter, and the jury was instructed by the court on the law of aiding and abetting.

## III.  DISCUSSION

**A.  Defense Counsel's Failure to Request a "Pinpoint" Instruction on Third Party Culpability Does Not Constitute Ineffective Assistance of Counsel**

At defendant's first trial, the jury was instructed on the presumption of innocence and reasonable doubt standards, as well as the elements of the charged offenses, but no "pinpoint" instruction regarding third party culpability was requested by the defense or given by the court. Defendant asserts that such a pinpoint instruction was necessary to clarify for the jury that he did not bear the burden of proving the existence of a culpable third party, and that it was not necessary for the jury to agree on the identity of a culpable

6

third party for the jury to return a verdict of not guilty.  He contends that counsel's failure to request such an instruction constituted ineffective assistance of counsel, and that he is therefore entitled to reversal of his convictions in the first trial on counts 2, 3, 4, and 5. We disagree.

To establish a claim of ineffective assistance of counsel, defendant must demonstrate "(1) the counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation prejudiced the defendant, i.e., there is a 'reasonable probability' that, but for counsel's failings, defendant would have obtained a more favorable result.  [Citations.]  A 'reasonable probability' is one that is enough to undermine confidence in the outcome.  [Citations.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 540-541, citing, among other cases, *Strickland v. Washington* (1984) 466 U.S. 668.) In evaluating trial counsel's actions, "[a] court must indulge a strong presumption that counsel's acts were within the wide range of reasonable professional assistance. [Citation.]" (*People v. Dennis*, *supra*, at p. 541.)  "Where the record on appeal sheds no light on why counsel acted in the manner challenged, we will affirm unless counsel was asked for an explanation and failed to provide one or unless there simply could be no satisfactory explanation for the action [or omission].  [Citation.]" (*People v. Jimenez* (1992) 8 Cal.App.4th 391, 397.)

Here, the record does not disclose why counsel did not request a "pinpoint" instruction on third party culpability.  As noted above, defendant's primary defense was that a third party, his passenger, had been the shooter, rather than defendant.  Defendant

7

identified that passenger as "Meech"; victim 2 identified the passenger as defendant's brother Martess. Either way, defense counsel argued, the prosecution had not established that the shots fired at Mr. Parris's car could have been fired by defendant, rather than his passenger, based on the trajectory of the impacts.

Nevertheless, the logical "satisfactory explanation" for counsel's conduct is that a separate instruction on third party culpability would have been duplicative of other instructions, namely, the standard instructions on reasonable doubt and the burden of proof that were given by the trial court, as well as the instructions given regarding the elements of the charged offenses. (See *People v. Hartsch* (2010) 49 Cal.4th 472, 504 (*Hartsch*) ([third party culpability instructions "add little to the standard instruction on reasonable doubt"].) The instructions given to the jury at defendant's first trial were unambiguous: no guilty verdict was possible unless the jury found that defendant himself committed the charged acts, because no instruction on the law of aiding and abetting was given. The instruction given for shooting at an occupied vehicle stated that "the People must prove that: [¶] One, *the defendant* willfully and maliciously *shot a firearm* and; [¶] Two, *the defendant shot the firearm* at an occupied motor vehicle." (Italics added.) The instruction on assault with a semiautomatic firearm similarly required the prosecution to prove that "*the defendant did an act* with a semiautomatic firearm . . . ." (Italics added.) The jury was instructed that the prosecution was required to prove all elements of the offenses beyond a reasonable doubt. Thus, if any evidence presented at trial raised a reasonable doubt in the jurors' minds that defendant committed the acts alleged—including, implicitly, evidence that another person is the one who committed

8

the acts—they had to find defendant not guilty. Defendant's proposed instruction on third party culpability would not have added anything of substance to the instructions given. There is no basis to conclude, therefore, that defense counsel's performance was deficient for failure to request it.

Defendant also has not established any prejudice from the lack of an instruction on third party culpability. (See *Hartsch*, *supra*, 49 Cal.4th at p. 504 [even where third party culpability instructions "properly pinpoint the theory . . . their omission is not prejudicial"], citing *People v. Ledesma* (2006) 39 Cal.4th 641, 720-721.) The jury here was well aware of the defense's theory that someone other than defendant had committed the crimes alleged, and defense counsel had ample opportunity to argue how evidence of third party culpability should be considered by the jury in deciding whether the prosecution had met its burden of proof. To reach the unanimous guilty verdicts they reached, under the instructions given, each juror must have been convinced that the evidence established beyond a reasonable doubt that *defendant*, and not any third party, did the acts that make up the elements of the offenses. "We of course presume 'that jurors understand and follow the court's instructions.'" (*People v. Wilson* (2008) 44 Cal.4th 758, 803 (*Wilson*), quoting *People v. Gray* (2005) 37 Cal.4th 168, 231.) Furthermore, as defendant acknowledges, both the defense and the prosecution specifically advised the jurors that they could not find defendant guilty unless they found he was the shooter. In these circumstances, there is no reasonable probability that the proposed instruction would have resulted in a more favorable outcome for defendant,

9

such as the jury hanging on all the charges against defendant, rather than just some, as defendant would have it.

In support of the notion that a third-party culpability instruction was necessary, Defendant asserts that the jury returned "totally inconsistent verdicts," arguing that jurors must have been "confused as to who the perpetrator/shooter was." We are not persuaded. First, we disagree that the jury's verdict of guilty on some charges was necessarily inconsistent with its inability to reach a unanimous verdict on others.[6] In any case, however, the existence of inconsistant verdicts does not imply that the jury was confused, let alone that additional instruction was necessary to resolve any confusion. (See *People v. Lewis* (2001) 25 Cal.4th 610, 656 ["An inconsistency may show no more than jury lenity, compromise, or mistake, none of which undermines the validity of a verdict."].) Nor do inherently inconsistent verdicts mean that reversal is required: "It is well settled that, as a general rule, inherently inconsistent verdicts are allowed to stand." (*Ibid*.) We have conducted an independent review of the record and conclude that the evidence, discussed above, is sufficient to support the guilty verdicts returned by the jury—indeed, defendant has not argued otherwise. (See *ibid*. [a defendant is protected against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts].)

---

[6] The jury in defendant's first trial failed to reach a verdict on charges requiring a finding that defendant personally fired shots that caused great bodily injury or death to Mr. Parris; the charges on which that jury convicted him required no such finding.

10

In short, defendant has not shown his counsel's performance at his first trial was deficient because counsel did not request a pinpoint instruction on third party culpability, nor has he shown any reasonable probability that the outcome of that trial would have been any different, had such an instruction been requested and given. As such, his ineffective assistance of counsel claim fails.

**B.  There Was No Prosecutorial Misconduct, Because the Prosecutor's Argument Regarding Aiding and Abetting Did Not Misstate the Law**

Defendant contends the prosecutor committed misconduct by misstating the law on aiding and abetting in closing argument of the second trial. Specifically, defendant objects to the prosecutor's comments that an aider and abettor and a direct perpetrator are "equally guilty."[7] This language, he argues, "improperly tied the aider and abettor's mental state to that of the perpetrator's, thereby lowering the prosecution's burden of proof," and incorrectly suggested that "if the jury concluded that the passenger was guilty of first degree murder, appellant was necessarily 'equally guilty.'" We are not persuaded that the prosecutor's statement constituted misconduct or, even assuming misconduct, that defendant suffered any prejudice.

---

[7] In closing, the prosecutor argued as follows: "So aiding and abetting, I just mentioned that. Person can be guilty of a crime in two ways. One, you commit the crime yourself. I shoot the person myself, I'm guilty. Or two, I aid and abet someone else who committed the crime. And that person's generally referred to in the instructions as the perpetrator. Again, CALCRIM partial—I can't fit it all up here—400. You can look at that yourself. Both are equally guilty. One is no more or less guilty than the other. If I kill someone or help you kill someone, we're both equally guilty."

11

"The standards governing review of misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such "'unfairness as to make the resulting conviction a denial of due process.'" [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial. [Citation.] In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review. [Citation.]'" (*People v. Parson* (2008) 44 Cal.4th 332, 359.) "Although counsel have 'broad discretion in discussing the legal and factual merits of a case [citation], it is improper to misstate the law. [Citation.]'" (*People v. Mendoza* (2007) 42 Cal.4th 686, 702, quoting *People v. Bell* (1989) 49 Cal.3d 502, 538.) Even where a prosecutor makes improper comments, reversal is not required unless there is "'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]'" (*People v. Brown* (2003) 31 Cal.4th 518, 553-554), quoting *People v. Frye* (1998) 18 Cal.4th 894, 970.)

Defendant concedes that his trial counsel did not object to the challenged comments, and that generally his claim would therefore be forfeited. We will nonetheless exercise our discretion to address the issue on the merits to forestall any

12

claim of ineffective assistance of counsel.  (See *People v. Lewis* (1990) 50 Cal.3d 262, 282.)

To say that an aider and abettor and a direct perpetrator are "equally guilty" is not a misstatement of the law, though it is a potentially incomplete description of the law of aiding and abetting.  (See *People v. Loza* (2012) 207 Cal.App.4th 332, 349-350 (*Loza*) [so describing instruction using "equally guilty" phrasing].)  Prior to 2010, CALCRIM No. 400, defining the general principles of aiding and abetting, provided that "'A person is *equally guilty* of the crime [of which the perpetrator is guilty] whether he or she committed it personally or aided and abetted the perpetrator who committed it.'" (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1165 (*Samaniego*), quoting CALCRIM former No. 400 (2009 rev., italics added).)  Several appellate courts noted, however, that in some extraordinary circumstances, the aider and abettor may have a mental state giving rise to a greater or lesser level of culpability than that of the direct perpetrator, so the phrase "equally guilty" may sometimes be misleading.  (*Samaniego*, *supra*, at pp. 1164-1165; *People v. Nero* (2010) 181 Cal.App.4th 504, 518-519 (*Nero*).)  In 2010, therefore, CALCRIM No. 400 was modified to omit the word "equally."  (See CALCRIM No. 400 ["A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator."].)

Nevertheless, it remains true that "'[g]enerally, a person who is found to have aided another person to commit a crime is "equally guilty" of that crime.'" (*Loza*, *supra*, 207 Cal.App.4th at pp. 349-350, quoting *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118.)  Placed in context, the challenged comments by the prosecutor were no more than

13

an articulation of this general principle. As such, the prosecutor did not commit misconduct by misstating the law.

Even if the challenged comments were improper, there is no reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. The challenged comments by the prosecution were brief and fleeting. The jury was instructed by the court using the most recent version of CALCRIM No. 400, omitting the challenged "equally guilty" language, and the court further instructed that if attorneys' comments on the law conflict with the court's instructions, the jury must follow the court's instructions. Nothing in the record suggests that the jury was confused about the court's instructions regarding aiding and abetting. (Cf. *Loza*, *supra*, 207 Cal.App.4th at p. 349 [jury's questions indicated confusion regarding aider and abettor mens rea]; *Nero*, *supra*, 181 Cal.App.4th at pp. 511-513 [similar].)

Moreover, the court's instructions other than CALCRIM No. 400 also effectively required the jury to find defendant himself acted with the requisite mental state for first degree murder to return a guilty verdict on that charge (as it did), no matter what theory of culpability it relied on in reaching that verdict. The instructions explain that "[s]omeone aids and abets a crime if he or she knows the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime." The instructions on the elements of first degree murder require a finding of an intent to kill. Taken together, for the jury to find defendant guilty of first degree murder on an aiding and abetting theory, it would have had to find defendant knew of another person's intent to kill and specifically

14

decided to aid in committing that act.  It would be "virtually impossible" to make such a decision "without at least a brief period of deliberation and premeditation, which is all that is required" for first degree murder.  (*Samaniego*, *supra*, 172 Cal.App.4th at p. 1166.)  Thus, in view of all the trial court's instructions, together with the jury's verdict of guilty on the charge of first degree murder, the jury necessarily determined defendant *himself* acted with the requisite mens rea for first degree murder, regardless of whether it found defendant to be the direct perpetrator or an aider and abettor.

In short, we do not find any misconduct on the part of the prosecutor and, even assuming misconduct, defendant suffered no prejudice from the challenged comments.

## IV.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


<u>    HOLLENHORST    </u>
                    Acting P. J.

We concur:

<u>    MCKINSTER    </u>
            J.

<u>    KING    </u>
            J.