Filed 8/7/15  P. v. Maravilla CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>OSCAR MARAVILLA,<br><br>    Defendant and Appellant. | A140467<br><br>(Alameda County<br>Super. Ct. No. C169865) |

Eighteen-year-old Jose Castrejon was shot twice and rendered a quadriplegic, an event that was captured on the video surveillance system of the store in which the shooting was committed.  Appellant Oscar Maravilla was arrested for the crime a month later after driving and crashing a stolen car while evading the police.  He was tried before a jury and convicted of attempted murder with firearm and great bodily injury allegations, evading an officer with willful disregard for safety, and taking and/or driving a vehicle. (Pen. Code, §§ 187, 664, 12022.5, subd. (a), 12022.53, subds. (b), (c), (d) & (g), 12022.7, subds. (a) & (b); Veh. Code, §§ 2800.2, subd. (a), 10851, subd. (a).)  The court sentenced appellant to an aggregate term of nine years eight months in prison, plus 25 years to life.[1]

---

[1]  The sentence was calculated as follows:  the nine-year upper term for the attempted murder count, plus eight months (one-third the middle term) for evading an officer, plus 25 years to life for intentionally discharging a firearm causing great bodily injury.  (Pen. Code, §§ 664, subd. (a), 12022.53, subd. (d); Veh. Code, § 2800.2, subd. (a).)  The sentences on the remaining counts and allegations were stayed.

1

Appellant argues the judgment must be reversed because the trial court admitted evidence of an informant's statement linking appellant to the crime.  He contends this evidence, which was admitted for the limited purpose of rebutting the defense claim that the police had rushed to judgment in identifying appellant as the shooter, was unduly prejudicial and not sufficiently probative.  Appellant also contends his trial attorney was ineffective in failing to object to testimony by the investigating officer that in his opinion, appellant was the shooter in the surveillance video.  He claims the cumulative effect of these alleged errors requires reversal, even if they were harmless when considered individually.  We affirm.

BACKGROUND

Castrejon, whose nickname is "Tito," grew up in East Oakland, where the Border Brothers gang operates.  Appellant is a member of the 81st Avenue Locos, a subset of that gang.  Though not a member himself, Castrejon had friends in the Border Brothers.  On March 3, 2012, Border Brothers gang member William "Koon" Mejia was murdered, and on May 14, 2012, police issued an arrest warrant for Manuel "Tito" Calderon in connection with that case.  Castrejon did not know Mejia, but he had heard about the murder and had been warned by his friends to be careful.  Castrejon was not concerned because he had no problems with anyone.

In 2012, Castrejon was selling small amounts of marijuana to three or four regular customers to supplement his income from his full-time job.  When his customers called, he would arrange to meet them at Tolins Market & Liquor, a store on International Boulevard, because he did not want to disrespect his uncle's house by selling drugs there.

On March 17, 2012, at about 8:00 p.m., Castrejon was waiting for a customer near the store entrance when appellant approached.  Castrejon recognized appellant from having met him a year and a half earlier, when they hung out together in a group for about 30 minutes to an hour smoking marijuana in a yard on 83rd Avenue.  Castrejon did not know appellant by name, and had not spoken to him when they were hanging out, but he assumed appellant was a Border Brother due to the way he was dressed.  Appellant's

2

hair had been short and cropped during the previous encounter, but it was long and curly when Castrejon saw him at the store.

When they encountered one another at the store entrance, appellant looked at Castrejon in a weird way like he was "mean-mugging" him, namely, looking at him "in a formal way, like he was going to do something." Castrejon asked appellant if he remembered him and told him his nickname was Tito. Appellant's demeanor changed after hearing this and he appeared to be "furious." Castrejon was worried and cut off the conversation. They spoke a second time in the store, but Castrejon did not recall what was said. Castrejon did not have a weapon and did not threaten appellant or become angry with him.

Castrejon was standing near an ice cream cooler when appellant approached him, pulled out a handgun, and shot him at close range before running out of the store. Castrejon heard a loud shot and felt a "stinging" and "burning" in his neck. His body shut down and he could no longer move. Patrons inside the store screamed and ran outside.

Shihab Anagar, who owned Tolins, was on his way to work when he heard the gunshots. He hid near the corner of the store and saw appellant run past with a shiny object in his hand. Anagar recognized appellant as a customer he had seen a few times before who had been in the store within weeks of the shooting. When Anagar went inside, he found Castrejon lying on the floor and told an employee to call the police.

Oakland Police Department Officer John McDonnell responded to the call and saw that Castrejon was still conscious though his breathing was labored. Castrejon told McDonnell he could not feel anything. McDonnell asked who had shot him, and although Castrejon was "a little hesitant," he said he had been shot by a Border Brother.

McDonnell applied pressure to Castrejon's wounds and waited for paramedics to arrive. Castrejon was taken to the hospital, where he was treated for two gunshot wounds on the right side of his body: one on his jawbone and one on his neck near his collarbone. His jaw was broken and he was bleeding inside his brain. One of the bullets had penetrated the C4 vertebrae, rendering him a quadriplegic.

Police obtained footage from the store's surveillance system, which showed the encounters between appellant and Castrejon and the shooting itself from several different angles. Oakland Police Department Officer Steven Bang, who was assigned as the lead investigator, reviewed the surveillance video. After receiving information from a fellow officer, he obtained a June 2011 booking photograph of appellant from an earlier case and concluded appellant was the shooter. Appellant has short hair in the booking photograph, but the shooter in the video has shoulder-length, curly hair.

Oakland Police Department Detective Leonel Sanchez obtained photographs taken at William Mejia's funeral that showed the shooter from the surveillance video (with the same long hair) sitting at the gravesite with another individual and standing in the crowd during the ceremony. Sanchez and Bang both identified the man in the photographs as appellant. Bang acknowledged the hair of the man in the photograph was different than appellant's hair in the June 2011 booking photograph (and from appellant's hair at the time of his arrest in April 2012), but based his identification on "the structure of the cheeks, the size of the cheek bones, structure and size of the jaw bone, the nose, the size and width of the eyebrows, standard things that I use to identify people every day." According to Bang, it was not uncommon for suspects to change their appearance to hide their identity after committing a crime. The practice was "so common it is even written into [the Oakland Police Department's] photo lineup admonishment which states that hairstyles are easily changed."

On March 21, 2012, Bang presented a photographic lineup of six pictures (six-pack) that included appellant's photograph to two store employees who had witnessed the shooting. One identified the photograph of appellant as the shooter, but then indicated he was not 100 percent sure. The other believed appellant's photograph looked like the shooter, but he could not say for sure.

On April 11, 2012, Deputy Fenton Culley of the Alameda County Sheriff's Department saw appellant driving a stolen Honda Civic on 90th Avenue and activated his patrol lights. During the 18-block chase that ensued, appellant entered an intersection without braking, crossed four lanes of traffic at a speed of about 60 miles per hour,

4

swerved into oncoming traffic to maintain a high speed, and ran through three controlled intersections without stopping. The Honda became airborne after hitting a speed bump and crashed into a parked car. Appellant and his passenger ran from the crash scene, stopping only when Culley drew his gun and ordered them to the ground. The passenger obeyed, but appellant began running again and was taken into custody by another officer. Appellant had short hair at the time of his arrest.

On April 25, 2012, Officer Bang showed Castrejon a six-pack lineup that included appellant's booking photograph and Castrejon identified appellant as the person who shot him. Castrejon also identified appellant at trial.

The prosecution's theory at trial was that when Castrejon identified himself as "Tito," appellant mistakenly believed he was the Emmanuel "Tito" Calderon who was arrested on March 6, 2013, for the murder of appellant's fellow Border Brother William Mejia. In addition to the evidence described above, Inspector Eugene Guerrero of the Alameda County District Attorney's Office testified as a gang expert about the history of the Border Brothers in East Oakland. In response to a hypothetical regarding the circumstances of the case, he opined that the shooting would have been motivated by revenge for the murder of Mejia.

The defense offered was one of mistaken identity. Appellant's sister, father and girlfriend testified that appellant was not the person on the surveillance video or in the pictures taken at Mejia's funeral, and that on the day of the shooting (which they remembered because it was one day before appellant's 18th birthday),[2] appellant had the same short haircut he had at the time of his arrest rather than the longer hairstyle worn by the shooter in the surveillance video.

---

[2] Although still 17 years old at the time of the shooting, appellant was tried as an adult on the attempted murder count pursuant to Welfare and Institutions Code section 707, subdivision (d).

## DISCUSSION

### A. *Evidence of Informant's Statement*

Appellant contends the judgment must be reversed because the court allowed the prosecution to present evidence of statements by an informant linking him to the shooting. He contends the evidence, though offered for the nonhearsay purpose of explaining the investigating officer's conduct, was more prejudicial than probative under Evidence Code section 352. We disagree.

### 1. Relevant Proceedings

On March 20, 2012, during the investigation of the Castrejon shooting, fellow Oakland Police Department Officer Melero advised Officer Bang that an informant had provided information about the identity of the shooter: that his name was "Oscar," that he was a male Hispanic who was about 5 feet 10 inches and 165 pounds, that his birthday was the same day as the shooting, that he was associated with a particular area in East Oakland, and that he had been shot in the stomach before. Later that same day, Melero spoke to Bang a second time and advised him that according to the informant, appellant and the deceased William Mejia were both Border Brothers and a man whose nickname was "Tito" had killed Mejia. The informant said the Border Brothers thought they had shot this Tito, but in fact it was the wrong Tito. Bang did not speak to the informant directly because his or her identity was confidential.

The prosecution sought to elicit details about what the informant had said to Melero for the purpose of explaining the subsequent actions taken by Bang during his investigation. Defense counsel objected on the grounds that the statements were double hearsay and more prejudicial than probative under Evidence Code section 352. The trial court agreed with defense counsel that the informant's statements were inadmissible hearsay if offered for their truth, and were more prejudicial than probative under Evidence Code section 352 if offered for the limited purpose of explaining Bang's subsequent actions. But it also indicated that if defense counsel pursued a strategy of showing that the investigation was inadequate because Bang focused prematurely on

6

appellant and did not consider other suspects, then the statements would be admissible so the jury could make a full assessment as to whether or not what the police did was reasonable.

During his cross-examination of Bang, defense counsel asked a number of questions about whether Bang had investigated other suspects or made any attempt to interview Border Brothers who might know something about the shooting. Bang testified that two other names were "thrown out" as suspects but eliminated, and there was no point in showing their photographs to Castrejon because appellant "matched the image of the suspect in the video." Bang also explained that he had not attempted to interview any other Border Brother.

Based on the cross-examination regarding Bang's failure to investigate other suspects, the prosecutor sought permission to question Bang about the informant's statement provided by Officer Melero. Defense counsel conceded he had "opened the door" under the court's previous ruling. He objected to the informant's statement about the shooter having been previously shot in the stomach, but indicated the "rest of it" was "okay." The court ruled that the prosecutor could elicit testimony about the informant's statement in its entirety. It gave a limiting instruction advising the jury it could only consider the conversation for the purpose of explaining Bang's investigation and conduct in the case, and not for the truth of the words spoken by the informant.

Bang testified about the content of the informant's statement as outlined above and explained that he used it to locate a booking photograph of appellant, who he determined was the shooter after comparing the photograph to the surveillance video.

2. Analysis

Under Evidence Code section 352, "[a] trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time." (*People v. Scott* (2011) 52 Cal.4th 452, 490.) The prejudice that section 352 seeks to avoid " ' "is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.]

"Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors. [Citation.]" [Citation.]' " (*Id*. at p. 491.) In other words, section 352 should be used to exclude relevant evidence " 'when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 439.) "A trial court's exercise of discretion under section 352 will be upheld on appeal unless the court abused its discretion, that is, unless it exercised its discretion in an arbitrary, capricious, or patently absurd manner." (*People v. Thomas* (2012) 53 Cal.4th 771, 806.)

Here, the defense attempted to undermine the prosecution's case by calling into question the thoroughness of Officer Bang's investigation and suggesting that other Border Brothers who were not contacted by Bang might more closely resemble the shooter on the surveillance video. When an officer's state of mind is at issue, an out-of-court statement relied on to make an arrest may be relevant and admissible to prove that state of mind. (See *People v. Ervine* (2009) 47 Cal.4th 745, 774 [statements admissible to show officer was lawfully performing professional duty when killed as necessary for special circumstance allegation in murder case]; *People v. Marsh* (1962) 58 Cal.2d 732, 738 [noting rule that statements an officer relies on to make an arrest are admissible to show probable cause].) Moreover, "[t]ips that inform law enforcement of criminal activity may be offered into evidence for the purpose of explaining actions undertaken pursuant to a criminal investigation; their function, courts reason, is to give context, rather than to prove criminal activity." (*United States v. Lovelace* (7th Cir. 1997) 123 F.3d 650, 652 (*Lovelace*) [harmless error for government to repeat four times that an informant had supplied information about the defendant's whereabouts when officers' intent had not been placed at issue by the defense and the evidence was not necessary to correct any impression of bias or impropriety]; see *United States v. Silva* (7th Cir. 2004) 380 F.3d 1018, 1020 [informant's statement relevant to explain why police targeted a seemingly random individual].)

8

Of course, the conduct of the investigation must be relevant to survive an objection based on the prejudicial nature of such evidence. (*Lovelace*, *supra*, 123 F.3d at p. 653.) Bang's conduct of the investigation was relevant because his early and exclusive focus on appellant was placed in issue by the defense. Evidence that he focused on appellant in response to the informant's statement as relayed to him by Officer Melero was relevant to meet the defense theory and to rebut the suggestion that Bang's failure to take additional steps was shoddy police work that called into question the results of his investigation. The trial court did not act arbitrarily or capriciously in concluding that evidence of the informant's statement, accompanied by an appropriate limiting instruction, was more probative than prejudicial under the circumstances.

Even if we assume the court should have excluded evidence of the informant's statements, the error was harmless because it is not reasonably probable appellant would have achieved a better result if those statements had been excluded. (See *People v. Jandres* (2014) 226 Cal.App.4th 340, 357 [state law errors such as erroneous ruling under Evid. Code, § 352 analyzed under standard of *People v. Watson* (1956) 46 Cal.2d 818, 836].) The trial court gave a detailed limiting instruction at the time the evidence was admitted, which we presume the jury followed. (*People v. Mendoza* (2007) 42 Cal.4th 686, 699-700; *People v. Lucero* (1998) 64 Cal.App.4th 1107, 1109-1110 [error to admit hearsay statement of witness to explain why officer lifted shoe print because legality of defendant's arrest not at issue, but error harmless because court gave limiting instruction and other evidence linked defendant to the crime].) Defense counsel was able to ameliorate the prejudicial effect of the informant's statement by making the point through cross-examination that Bang did not know the identity of the informant or anything about his or her reliability. The jurors viewed a surveillance video clearly showing the shooter's face and were able to determine for themselves whether appellant was the same person. And, the case was a strong one even apart from the surveillance video: appellant was identified by Castrejon and Anagar, both of whom were familiar with his appearance; and his flight from police during a high-speed chase a month after the

9

shooting was a disproportionate response to an auto theft, strongly suggesting a consciousness of guilt for a more serious offense.

B. *Ineffective Assistance of Counsel*

Appellant contends his trial attorney provided ineffective assistance of counsel because he did not object to Officer Bang's testimony that appellant was the shooter in the surveillance video. He complains that this testimony amounted to an inadmissible lay opinion and invaded the province of the jury to determine guilt. We disagree.

"To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. [Citations.] Counsel's performance was deficient if the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Prejudice exists where there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93 (*Benavides*), citing *Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 693-694.)

" 'Tactical errors are generally not deemed reversible; and counsel's decisionmaking must be evaluated in the context of the available facts. [Citation.] To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . ." ' " (*People v. Hart* (1999) 20 Cal.4th 546, 623-624.) "A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

The decision to object to certain evidence is tactical in nature and only rarely will a failure to object amount to ineffective assistance. (*People v. Williams* (1997) 16 Cal.4th 153, 215.) Appellant cannot establish that his trial attorney's failure to object to Bang's testimony fell below an objective standard of reasonableness because he has not

established that such an objection would have been sustained. (*People v. Weaver* (2001) 26 Cal.4th 876, 931 [counsel has no duty to make futile objections].)

A lay witness may give an opinion that is "(a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his testimony." (Evid. Code, § 800.) Case law has recognized that a lay witness who has personal knowledge of a subject's appearance may testify to the identity of that subject in a surveillance photo or video when such testimony would be of assistance to the trier of fact, even when that personal knowledge is gained after the commission of the crime. (*People v. Larkins* (2011) 199 Cal.App.4th 1059, 1065-1068 (*Larkins*) [in case involving thefts from health club lockers, loss prevention manager properly testified that he recognized man in surveillance videos as defendant because he had viewed him on other surveillance videos]; *People v. Ingle* (1986) 178 Cal.App.3d 505, 513 ["where for any reason the surveillance photo is not conclusive on the identity issue, the opinion testimony of those persons having knowledge based upon their own perceptions [citation] of defendant's appearance at or before the time the crime occurred is admissible on the issue of identity, and such evidence does not usurp or improperly invade the province of the trier of fact"]; *People v. Mixon* (1982) 129 Cal.App.3d 118, 128-129 [officers who were familiar with defendant through a number of prior contacts properly testified that he was the robber in a surveillance photograph, though he had changed his facial hair by the time of trial]; *People v. Perry* (1976) 60 Cal.App.3d 608, 611-613 [police officer and parole agent who knew defendant properly testified he was the robber in a surveillance film; testimony did not invade the province of the trier of fact and questions about the degree of their knowledge went to weight of evidence, not its admissibility].)

Officer Bang personally met with appellant after his arrest and had studied a number of photographs of him, giving him the personal knowledge necessary to render admissible his testimony identifying appellant as the shooter. More importantly, the jurors had access to the video and could make that comparison themselves. (See *Larkins*, *supra*, 199 Cal.App.4th at p. 1068 ["the jurors were able to test the manager's opinion that defendant was the person in the 20 to 30 videos because they saw still photos taken

11

from some of the videos and they could test his ability to correctly identify defendant"].) In light of the defense challenge to the reasonableness of Bang's investigation, it was inevitable the jurors would hear evidence from which they could infer that Bang had focused on appellant because he believed the booking photograph matched the shooter in the video. A defense objection would not have prevented the jury from learning that Bang had concluded appellant was the shooter based on appellant's appearance.

Even if we assume the court might have excluded some portion of Bang's testimony regarding appellant's identity as the shooter under Evidence Code section 352 or some other provision, we cannot conclude on this record that defense counsel lacked a tactical purpose in failing to object. The defense at trial was mistaken identity, with one of the strategies being to show that Bang's investigation was inadequate and that he had prematurely (and incorrectly) identified appellant as the shooter, even though it was not clear from the video that the long-haired man in the surveillance video was the same person as the short-haired man arrested a month later. If the jurors were persuaded that appellant's appearance in the courtroom or in his photographs matched that of the shooter on the video, Bang's opinion would be of little import; but if they were uncertain, Bang's testimony to the effect that he had not pursued other avenues of investigation because he was convinced of the shooter's identity would tend to support the defense position that Bang's identification had been premature and that the "real" shooter could have been found if the police had looked more carefully.

Finally, appellant has failed to establish prejudice. The evidence of appellant's guilt was strong, consisting of an eyewitness identification by the victim, who had met appellant previously and had spoken to him just prior to the shooting; an eyewitness identification of appellant by the store owner, who had previously seen appellant in the store more than once; two more tentative eyewitness identifications by store employees who witnessed the shooting; appellant's reckless flight from officers when he was arrested a month later; and a likely motive arising from the nickname the victim shared with the person believed to have killed William Mejia. Most importantly, the jurors could clearly see the shooter's face in the video itself and could compare it to the other

12

photographs of appellant and his appearance in the courtroom to render their own decision about appellant's guilt. It is not reasonably probable that if defense counsel had objected to Bang's testimony that appellant was the shooter in the video, appellant would have obtained a more favorable verdict. (*Benavides*, *supra*, 35 Cal.4th at pp. 92-93.)

## C. *Cumulative Error*

Appellant contends the cumulative effect of the two asserted errors requires reversal. We have rejected the merits of appellant's arguments and concluded that any error was harmless; "[c]onsidering them together, we likewise conclude that their cumulative effect does not warrant reversal of the judgment." (*People v. Bolden* (2002) 29 Cal.4th 515, 567-568.)

## DISPOSITION

The judgment is affirmed.

_____
NEEDHAM, J.

We concur.

_____
JONES, P.J.

_____
BRUINIERS, J.

13