Filed 10/28/22 P. v. Wood CA6
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H047308 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1766176) |
| v. | |
| LAWRENCE ALEXANDER WOOD, | |
| Defendant and Appellant. | |

The charges against defendant Lawrence Alexander Wood arose from a home invasion and robbery in which two persons were shot. A jury found Wood guilty on three counts of first degree robbery and found true various firearm allegations, including that he personally and intentionally discharged a firearm, causing great bodily injury. The trial court found true allegations of prior convictions, including a strike prior. The court imposed a total term of 25 years to life consecutive to 46 years in prison.

Wood raises numerous claims on appeal. First, he contends the prosecutor committed misconduct during closing argument by shifting the burden of proof to the defense. Second, he contends the trial court violated his due process rights by instructing the jury to consider how certain a witness was when the witness made an identification. Third, he contends the trial court erred in denying his *Romero*[1] motion to strike the prior strike conviction. For the reasons below, we conclude these claims are without merit.

---

[1] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

Wood further contends we must remand for resentencing based on recent legislative amendments to Penal Code sections 667.5 and 1170, and he challenges the imposition of fines and fees on various grounds including his inability to pay them under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).[2] The Attorney General concedes we must remand for resentencing based on recent changes to the sentencing laws, and we accept the concession. Because we are remanding for a new sentencing hearing, Wood may assert his *Dueñas* claim below.

Accordingly, we will reverse the judgment and remand for a new sentencing hearing limited to the matters identified above.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural Background

The prosecution charged Wood with three counts of first degree robbery of an inhabited dwelling while acting voluntarily in concert with two or more other persons. (§§ 211, 213, subd. (a)(1)(A).) As to count 1, the prosecution alleged Wood intentionally discharged a firearm causing great bodily injury or death and that he personally discharged a firearm (§ 12022.53, subds. (c) & (d)). As to all three counts the prosecution alleged Wood personally used a firearm (§ 12022.53, subd. (b)). The prosecution further alleged Wood had suffered a prior strike conviction and a prior serious felony conviction (§§ 667, subd. (a), subds. (b)-(i), 1170.12), and that he had served a prior prison term (§ 667.5, subd. (b)).

A jury found Wood guilty as charged and found the firearm enhancements true. The trial court found the prior conviction allegations true.

The trial court imposed an aggregate term of 25 years to life consecutive to a determinate term of 46 years in prison. The term consisted of 18 years (the aggravated term of nine years doubled for the strike) for count 2; four years for each of counts 1 and

---

[2] Subsequent undesignated statutory references are to the Penal Code.

3; 10 years for the firearm enhancement on count 2; 10 years for the prior serious felony enhancements; and a term of 25 years to life for the firearm enhancement under section 12022.53, subdivision (d). The court stayed the one-year enhancement for the prior prison term.

### B. Facts of the Offenses

The prosecution alleged Wood was one of several men with guns who entered a home, shot two of the inhabitants, and stole marijuana, computers, and a gaming console. One of the victims who was shot—Marcus Sherman—identified a photograph of Wood in a lineup, and Sherman identified him again at trial. A cell phone found outside the home after the robbery contained videos of Wood recorded earlier that day, including a video showing a bag with a pistol inside. The prosecution presented forensic evidence that the bullet that struck Sherman was fired from a .32-caliber pistol. The prosecution also showed the jury photos of a .32-caliber pistol for the jury to compare with the pistol shown in the video found on the cell phone. The defense argued Wood was misidentified.

The robbery occurred in San Jose on December 28, 2016. Four residents were at home at the time: Aldrich DSilva, Marcus Sherman, Jerett Vongunten, and Devin Powell. DSilva testified that he was watching videos on a computer in the dining room, while Sherman and Vongunten were in the next room. Around 10:00 p.m., four men entered the house, each armed with a pistol. One of the men pointed a gun at DSilva and told him not to move. DSilva complied while the man held the gun on him, and the other men went into the room where Sherman and Vongunten were. DSilva then heard two gunshots and a lot of yelling coming from the other room. A few minutes later, he saw the men "trying to take whatever they could" and carrying the property out of the house in a laundry basket.

Vongunten testified that he and Sherman were in the game room when two men entered with handguns and started yelling, "sit down," "shut up," and other threats. One

3

man pointed a gun at Vongunten while the other man pointed a gun at Sherman. Vongunten heard Sherman get shot, and Vongunten himself was shot in the knee shortly thereafter. Vongunten then saw the man who shot Sherman taking Sherman into his bedroom.

Sherman testified that he was sitting in the game room of the house when the armed men entered. One of the men, described by Sherman as African-American with short bunchy braids in his hair, stood directly in front of Sherman and pointed a gun at his face three or four inches away. When Sherman moved the gun away from his face, the man shot him in the thigh. The man who shot Sherman then lifted him up and took him at gunpoint to his bedroom to unlock the door. Sherman unlocked the door and let the man into the bedroom, where Sherman's partner Powell had been sleeping. The man threatened to kill Powell and ordered her to hand over some duffel bags with marijuana. She complied, and the man left the room. Sherman identified Wood as the man who shot him in the thigh.

Jose Luis Hernandez Huerta lived in the house next door to the victims' house. Huerta testified that he was outside walking across the street toward his house when he heard a sound like firecrackers coming from Sherman's house, whereupon three people ran out of the house. One of the men fell down and the man's cell phone fell out of his pocket. The man got up and kept running, leaving his phone behind. Huerta picked up the phone, and when the police arrived, he gave it to them.

The police searched the phone and found multiple videos of Wood recorded on the day of the robbery. One of the videos showed Wood with a Gucci bag containing a pistol. T-Mobile records identified the cell phone subscriber as "Wood ASAP." The police also found an email account with the name "ASAPWood25" and "ASAP" had been used in social media and videos "affiliated" with Wood. One of the videos showed Wood outside a Round Table Pizza with the letters "ASAP" stamped into the video image.

None of the guns used in the shooting were recovered, but investigators recovered a shell casing and a bullet at the home. The bullet, found in the game room, had been fired, and DNA taken from blood on the bullet matched Sherman's DNA. Criminalist Karla Hankel testified for the prosecution as an expert in firearms examination and toolmark identification. Based on her examination of the bullet, she opined that it had could have been fired from one of two types of guns: a Sauer & Sohn .32-caliber pistol, or a People's Republic of China .32-caliber pistol. The prosecution introduced into evidence several photos of a Sauer & Sohn .32-caliber pistol.

## II. DISCUSSION

### A. Prosecutorial Misconduct

Wood contends the prosecutor committed misconduct in closing argument by improperly shifting the burden of proof. The Attorney General contends the prosecutor did not commit misconduct because his argument did not shift the burden of proof, and furthermore that trial counsel for Wood forfeited the claim by failing to object. Wood argues that if his trial counsel forfeited the claim by failing to object, then counsel rendered ineffective assistance.

### 1. Background

In closing argument, the prosecutor argued that a forensic analysis of the bullet that struck Sherman showed it was fired from one of two types of .32-caliber pistols—a Sauer & Sohn pistol, or a People's Republic of China pistol. The prosecutor showed the jury photos of a Sauer & Sohn .32-caliber pistol (not the gun used in the offense) and argued that it appeared to be the same type of gun as the gun shown in the video on Wood's phone. In closing argument for the defense, Wood's trial counsel challenged the adequacy of the analysis performed by the prosecution's firearms expert, Karla Hankel.

In rebuttal, the prosecution argued as follows: "The burden, ladies and gentlemen, is on the People. It is my burden to prove this case beyond a reasonable doubt. Defense does not have a burden. The defense does have a power to subpoena witnesses, put on

5

evidence. [¶] The defense is attacking Ms. Hankel and suggesting that there's some other kind of gun out there it could have been and they could have analyzed. They could have called a gun expert in here, look at the bullet, give a different opinion, look at the casing, if they think that the casing was something that would exonerate the defendant. But they didn't do that here. [¶] There is no evidence—and you cannot speculate—there is no evidence suggesting any other gun."

Defense counsel did not object.

### 2. *Legal Principles*

"Although counsel have 'broad discretion in discussing the legal and factual merits of a case [citation], it is improper to misstate the law. [Citation.]' [Citation.]" (*People v. Mendoza* (2007) 42 Cal.4th 686, 702.) Furthermore, " 'it is error for the prosecution to refer to the absence of evidence that only the defendant's testimony could provide.' [Citation.]" (*People v. Carter* (2005) 36 Cal.4th 1215, 1266.) "A prosecutor is permitted, however, to comment on a defendant's failure to introduce material evidence or call logical witnesses." (*People v. Brown* (2003) 31 Cal.4th 518, 554 (*Brown*).) We consider a prosecutor's statements in closing argument in the context of the argument as a whole. (*People v. Dennis* (1998) 17 Cal.4th 468, 522 (*Dennis*).)

" ' "When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated." ' [Citations.] ' "Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury." [Citation.]' [Citation.] Misconduct that does not constitute a federal constitutional violation warrants reversal only if it is reasonably probable the trial outcome was affected. [Citation.]" (*People v. Shazier* (2014) 60 Cal.4th 109, 127.)

6

" ' "As a general rule, a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." ' [Citations.]" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 894 (*Covarrubias*).)

To establish ineffective assistance of counsel, the defendant bears the burden of showing trial counsel's performance was deficient: that counsel's performance "fell below an objective standard of reasonableness" in light of the prevailing professional norms. (*Strickland v. Washington* (1984) 466 U.S. 668, 688 (*Strickland*).) " 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' " (*People v. Weaver* (2001) 26 Cal.4th 876, 925-926.) Second, the defendant must show the asserted deficiency in counsel's performance resulted in prejudice:  a " ' "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' " (*Id.* at p. 955.)

### 3.  *The Prosecutor's Statements Did Not Constitute Misconduct*

Wood's claim centers on the prosecutor's argument in rebuttal that Wood "could have called a gun expert in here, look at the bullet, give a different opinion, look at the casing, if they think that the casing was something that would exonerate the defendant. But they didn't do that here."  Based on the principles that a prosecutor may not misstate the law and the prosecution has the burden of proof, Wood argues these statements constituted misconduct because the prosecutor misstated the law by shifting the burden of proof to Wood.  As the Attorney General points out, however, the prosecutor immediately preceded these statements with the following:  "The burden, ladies and gentlemen, is on the People.  It is my burden to prove this case beyond a reasonable doubt.  Defense does not have a burden."

7

As Wood concedes, a prosecutor is generally permitted to comment on a defendant's failure to call witnesses, provided the comment does not implicate the defendant's own decision not to testify. (*Brown*, *supra*, 31 Cal.4th at p. 554.) Nothing in the prosecutor's comments here could be construed as a comment on Wood's silence. Furthermore, we must consider a prosecutor's statements in context. (*Dennis*, *supra*, 17 Cal.4th at p. 522.) Because the prosecutor immediately preceded his comments by correctly stating that the prosecution—not the defense—bore the burden of proof, nothing in the prosecutor's argument could have been reasonably interpreted as improper burden-shifting. (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1340 [prosecutor's comments did not impermissibly shift the burden because prosecutor stated at the outset the prosecution had the burden of proof].)

Even assuming the prosecutor's comments were objectionable, defense counsel made no such objection. Nor did counsel ask the court the admonish the jury. The claim is thereby forfeited on appeal. (*Covarrubias*, *supra*, 1 Cal.5th at p. 894.) Wood argues his counsel was ineffective, but even assuming the failure to object constituted deficient performance, Wood has not shown a reasonable probability of a more favorable outcome in the absence of any error. The prosecution presented strong evidence of Wood's identity apart from the expert's testimony, and the comments the prosecutor made in closing argument were unlikely to mislead jurors into thinking the defense had the burden of proof. Absent any prejudice under *Strickland*, *supra*, 466 U.S. at page 688, Wood is not entitled to relief.

For the reasons above, we conclude this claim is without merit.

### B. Jury Instruction on the Certainty of Witness Identification

Based on former CALCRIM No. 315, the trial court instructed the jury, in evaluating identification testimony, to consider, "How certain was the witness when he or she made an identification?" Wood contends the trial court violated his due process

8

rights by so instructing the jury. The Attorney General contends the court properly instructed the jury.

### 1. Factual Background

Sherman testified that he was sitting on a couch in the game room of the house when the armed men entered. One of the men, described by Sherman as African-American with short bunchy braids in his hair, stood directly in front of Sherman and pointed a gun at his face three or four inches away. When Sherman moved the gun away from his face, the man shot him in the thigh. The man who shot Sherman then lifted him up and took him at gunpoint to his bedroom to unlock the door.

About four months after the robbery, the police showed Sherman three photographic lineups with six photos in each, and Sherman identified a photo of Wood as the man who shot him. In court, Sherman again identified Wood as the shooter.

On cross-examination, defense counsel asked Sherman if he had made any tentative identifications of any of the other persons in the photographic lineups. Sherman replied, "I believe there were other photographs in those photographs that bore, perhaps, similarities or that, at the time, I thought had, perhaps, features that were similar to the person that shot me. *But the only definitive identification that I made, in terms of the man who shot me, was to positively identify your client*." (Italics added.)

On further cross-examination, Sherman testified that he had told police another one of the persons shown in the photographic lineups had eyes, nose, and lips that were similar to those of the man who shot him. He also said another person had a build and complexion similar to those of the shooter. Sherman then added, "I believe I made several statements regarding the reasons I believed the defendant to be the man who shot me." Defense counsel asked Sherman to explain, and Sherman testified, "I believe they also had to do with—with, like, facial structure, as I said earlier, like, the kind of the thinness in the bridge of the nose compared to widening out at the bottom; a thinner upper lip as compared to the bottom lip; the eyes—a kind of heavier eyelids; and, also, a

9

very strong emotional reaction to seeing the photograph of the defendant." When defense counsel again asked Sherman if he had identified another person with similar features, Sherman responded, "There was, I believe, another gentleman, as you've referenced, in that—in those photo spreads that did share similar features. *Your client is the only person I definitively picked out as the man who shot me.*" (Italics added.)

Defense counsel then asked Sherman if he did anything else to investigate the person who shot him, and Sherman responded that after police gave him the name of a person in custody, he searched Facebook, adding, "I found your client's profile, with his photograph on it, which then showed me that the person that they had in custody was the person that had shot me."

### 2. Legal Standards

" 'The touchstone of due process is fundamental fairness.' [Citations.] A jury instruction may ' "so infuse[ ] the trial with unfairness as to deny due process of law." ' [Citation.] However, ' "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is ' "whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process." ' " ' [Citation.] ' "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." ' [Citations.] ' "If the charge as a whole is ambiguous, the question is whether there is a ' "reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " ' [Citation.]" (*People v. Lemcke* (2021) 11 Cal.5th 644, 655 (*Lemcke*)). We apply the de novo standard of review to the correctness of a jury instruction. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

### 3. The Jury Instruction on Witness Certainty Did Not Violate Due Process

In *Lemcke*, *supra*, 11 Cal.5th 644, issued after Wood's trial had concluded, the California Supreme Court acknowledged the significance of empirical research casting doubt on the reliability of witness certainty in eyewitness identifications. Under its

10

supervisory powers, the California Supreme Court directed trial courts to omit the certainty factor from CALCRIM No. 315 to give the Judicial Council an opportunity to review the challenged language. (*Id.* at p. 669.) As Wood concedes, however, the Supreme Court in *Lemcke* found no due process violation. (*Id.* at pp. 661-662.)

Wood argues the circumstances of this case are distinguishable from *Lemcke*. He points to the fact that in *Lemcke* the defense presented expert witness testimony challenging the accuracy of eyewitness identifications. He argues that because he presented no such expert testimony, the objectionable jury instruction violated his due process rights. But the presence of defense expert testimony was not a determinative factor in the Supreme Court's holding in *Lemcke*, and Wood was not denied the opportunity to call such an expert in his case. The Supreme Court in *Lemcke* also noted the defense had the opportunity to cross-examine the identifying witness at length concerning inconsistencies in her identification, as did Wood's counsel. And the defense in *Lemcke* cross-examined the police regarding "problematic aspects of the identification procedures." (*Lemcke, supra*, 11 Cal.5th at pp. 659-660.) Counsel here had the same opportunities. In short, *Lemcke*'s discussion of the expert's testimony and defense cross-examination was presented to illustrate that the defendant was not denied an *opportunity* to present a defense; the *Lemcke* court did not hold the defendant would have suffered a due process violation in the absence of such a record. Wood was not denied the chance to present similar expert testimony, and defense counsel did cross-examine the identifying witness regarding the details of his identification. In fact, the testimony from Sherman about his "definitive" identification of Wood—the part of Sherman's testimony that amounts to an expression of certainty—was elicited by defense counsel in cross-examination.

Furthermore, as in *Lemcke*, the trial court instructed the jury to consider, in evaluating witness testimony, that "[p]eople sometimes honestly forget things or make mistakes about what they remember"; that "[y]ou alone must judge the credibility or

11

believability of the witnesses"; and that the prosecution had the burden to prove Wood's guilt beyond a reasonable doubt. (*Lemcke, supra*, 11 Cal.5th at p. 658.) Considering " ' "the context of the instructions as a whole and the trial record" ' ", *id.* at page 661, we see no basis to distinguish *Lemcke,* nor any grounds for a due process violation in the record of Wood's case.

For the reasons above, we conclude this claim is without merit. Wood also contends the two errors asserted above require reversal because they resulted in cumulative prejudice, but because neither claim constituted error, there is no prejudice to cumulate.

### C. *Denial of Wood's* **Romero** *Motion*

Wood contends the trial court abused its discretion in denying his motion to strike a prior strike conviction under *Romero* based on his youth and the passage of time. The Attorney General contends the trial court did not abuse its discretion because Wood's prior conviction fell within the spirit of the "Three-Strikes" law (§§ 667, subds. (b)-(i), 1170.12).

#### 1. *Procedural Background*

Wood committed the prior strike offense in June 2007, nine years before committing the current offense. He was 18 years old at the time. Wood's neighbors told police a beer bottle had been thrown at their front door, whereupon they went next door to Wood's house where a party was ongoing. Wood answered the door, and upon hearing the neighbors' complaint, he left and returned with several other males, one of whom was holding a shotgun. The man "racked" the gun and pushed it toward one of the neighbors while threatening to kill him. The neighbors retreated to their home and called the police. Wood and two other men then went to the neighbors' house and knocked on the door. When a neighbor answered, he saw Wood standing behind the other two men. When Wood attempted to conceal something in his waistband, the neighbor asked Wood what he was doing, whereupon Wood showed him the shotgun. Wood was convicted of

making criminal threats (§ 422) with a firearm enhancement (§ 12020, subd. (a)(1)), and the trial court granted a three-year term of probation with 120 days in jail. Wood violated the terms of his probation four months later and the court sentenced him to five years in prison.

Wood moved in this case to strike the prior conviction under *Romero*. Wood argued the conduct underlying the prior offense was dissimilar to the conduct in the current offense; that the prior conviction was remote in time; and that the resulting sentence would be excessive if the motion were denied. The probation report recommended granting the *Romero* motion.

In denying the *Romero* motion, the court stated, "I certainly understand my ability to exercise discretion to strike the serious or violent felony. I do not think it is appropriate here. I believe Mr. Wood falls within the spirit of the three strikes law. This case was exceptionally violent and unnecessarily violent. He has shown increasing criminality and inability to comply with the terms of supervision on parole previously." The court added, "I certainly understand the issues for the family and friends of Mr. Wood to lose him to a life of prison but our community needs to have Mr. Wood in prison because he has shown an exceptional trend towards violence."

### 2. *Legal Principles*

A trial court is empowered under section 1385, subdivision (a) to dismiss prior felony conviction allegations (i.e., prior strikes) in cases brought under the Three Strikes law. (*Romero*, *supra*, 13 Cal.4th at pp. 529-530.) The court's discretion, however, is limited to instances in which dismissing such strikes is in the furtherance of justice, as determined by giving " ' "consideration both of the constitutional rights of the defendant, and the interests of society represented by the People . . . ." ' " (*Id*. at p. 530.)

The granting of a *Romero* motion is "subject to review for abuse of discretion. This standard is deferential. [Citations.] But it is not empty. Although variously phrased in various decisions [citation], it asks in substance whether the ruling in question 'falls

13

outside the bounds of reason' under the applicable law and the relevant facts. [Citations.]" (*People v. Williams* (1998) 17 Cal.4th 148, 162; see also *People v. Garcia* (1999) 20 Cal.4th 490, 503.) It is the defendant's burden as the party attacking the sentencing decision to show it was arbitrary or irrational, and, absent such showing, there is a presumption that the court " ' "acted to achieve [the] legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' [Citations.]" (*People v. Carmony* (2004) 33 Cal.4th 367, 376-377 (*Carmony*).) Such a discretionary decision " ' "will not be reversed merely because reasonable people might disagree." ' " (*Ibid.*)

### 3. *Denial of the* Romero *Motion Was Not an Abuse of Discretion*

Wood contends the trial court abused its discretion because the strike offense was far in the past, and he was young at the time—five days past his eighteenth birthday. He points to the lack of violent criminal conduct between the time of the prior offense and the current offense. He argues that given the sentence imposed here—25 years to life consecutive to 46 years—he would still be punished severely and adequately even if the motion had been granted. Accordingly, Wood argues, "it made sense" to strike the prior conviction.

While significant time had passed, and Wood was young at the time of the first offense, we do not review the trial court's decision based on whether a reasonable jurist would have granted the motion; we must apply the abuse of discretion standard of review. "[A] trial court will only abuse its discretion in failing to strike a prior felony conviction allegation in limited circumstances." (*Carmony*, *supra*, 33 Cal.4th at p. 378.) Wood cites no case in which a court of review reversed the denial of a *Romero* motion based on grounds comparable to those presented here. The trial court acknowledged the harshness of the sentence but based its decision on the "exceptionally violent" nature of the crime, which the court perceived to be part of a trend toward increasing violence. In

14

doing so, the court did not abuse its discretion. Accordingly, we conclude this claim is without merit.

### D. Remand for Resentencing

Wood contends recently enacted legislation that changed the sentencing laws applies to him retroactively, such that we must remand for resentencing under the new laws. The Attorney General concedes these claims.

### 1. Retroactive Application of Senate Bill No. 136

The trial court imposed but stayed a one-year enhancement under section 667.5, subdivision (b). Wood argues the prior prison term enhancement must be stricken because the recent enactment of Senate Bill No. 136 eliminated the imposition of enhancements under that code section for all offenses except sexually violent offenses. The Attorney General concedes. We conclude the concession is well-taken.

Effective January 1, 2020, section 667.5, subdivision (b) only applies if the prior prison term was served for a sexually violent offense as defined in subdivision (b) of section 6600 of the Welfare and Institutions Code. (Stats. 2019, ch. 590, § 1.) In this case, Wood served a prior prison term for violating section 422 (criminal threats). The prior prison term enhancement does not apply to Wood under the amended statute.

Wood was sentenced in April 2019, before the effective date of the new law. This change in law, however, applies retroactively to non-final judgments. (*In re Estrada* (1965) 63 Cal.2d 740, 745-748; *People v. Matthews* (2020) 47 Cal.App.5th 857, 865, abrogated on other grounds by *People v. Stamps* (2020) 9 Cal.5th 685.) The judgment, now on appeal, is not yet final. Wood is therefore entitled to the benefit of the change in law. Accordingly, we will order the trial court to strike the enhancement on remand.

### 2. Retroactive Application of Senate Bill No. 567 and Assembly Bill No. 124

The trial court imposed the aggravated term for the robbery conviction on count 2. Wood contends recently enacted Senate Bill No. 567 (Stats. 2021, ch. 731, § 653) (Senate Bill 567) and Assembly Bill No. 124 (Stats. 2021, ch. 695, § 6) (Assembly Bill 124)

apply retroactively to him and require remand for resentencing with respect to the upper term imposed for robbery. The Attorney General concedes. We conclude the concession is well-taken.

Effective January 1, 2022, Senate Bill 567 and Assembly Bill 124 amended section 1170 in several ways. The amended version of subdivision (b) of section 1170 makes the middle term presumptive in the absence of certain circumstances. (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1038 (*Flores*).) Under subdivision (b)(2) as amended, "The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).) Under subdivision (b)(6) as amended, "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice," the court must impose the lower term if one of three specified factors contributed to the commission of the offense. As relevant here, one of these factors is whether "[t]he person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence." (§ 1170, subd. (b)(6)(C).)

The amendments to section 1170, subdivision (b) apply retroactively to this case as an ameliorative change in the law that applies to all nonfinal convictions on appeal. (*Flores*, *supra*, 73 Cal.App.5th at p. 1039, citing *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 308.) Furthermore, the Attorney General concedes that because Wood was sentenced prior to the amendment of section 1170, this matter should be remanded for resentencing to give Wood an opportunity to present any evidence that he has experienced psychological, physical, or childhood trauma under section 1170,

16

subdivision (b)(6)(C). We accept the concession and we will remand for resentencing accordingly.

### 3. *Retroactive Application of Assembly Bill No. 1869*

The trial court imposed a $129.50 criminal justice administration fee under Government Code sections 29550, 29550.1, and 29550.2. Wood contends we must order the trial court to modify the abstract of judgment to strike the fee based on the newly enacted Assembly Bill No. 1869 (Assembly Bill 1869). The Attorney General concedes this claim. We accept the concession insofar as the fee must be modified, but the new law does not empower us to strike it in its entirety.

Effective July 1, 2021, Assembly Bill 1869 revised Government Code section 611, which now provides, "On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to . . . [Government Code] [s]ections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Gov. Code, § 6111, subd. (a).) "[B]y its plain terms the ameliorative changes of Assembly Bill 1869 apply retroactively to make any unpaid portion of the identified assessments, as they existed on June 30, 2021, 'unenforceable and uncollectible' as of July 1, 2021. (Stats. 2020, ch. 92, §§ 11, 62.)." (*People v. Greeley* (2021) 70 Cal.App.5th 609, 626.) "[A]lthough the unpaid balance of the identified fees is no longer enforceable and collectible, the statute also mandates that any portion of a judgment imposing those fees be vacated. Accordingly, based on the plain language of the statute, the unpaid balance of the probation supervision and criminal justice administration fees must be vacated." (*Id.* at pp. 626-627, fns. omitted.)

The record does not show what portion of the criminal justice administration fee, if any, remained unpaid as of July 1, 2021. Accordingly, we will order the trial court on remand to vacate the portion of the judgment requiring payment of any balance on the criminal justice administration fee that remained unpaid as of July 1, 2021.

## 4. *Ability to Pay Fines and Fees*

In addition to the $129.50 criminal justice administration fee, the trial court imposed various additional fines and fees, including $7000 in victim restitution with a 15 percent administration fee; $10,000 in restitution under section 1202.4; a $120 court security fee; a $90 conviction assessment; and $10 with penalty assessment under section 1202.5. The court found Wood had the ability to pay these fines and fees but did not hold a hearing on the matter.

Wood contends the trial court erroneously imposed these fines and fees without determining his ability to pay them as required under *Dueñas*, *supra*, 30 Cal.App.5th 1157.[3] The Attorney General contends Wood forfeited this claim by failing to object; that victim restitution does not require a showing of ability to pay; and that the trial court did not abuse its discretion by finding Wood had the ability to pay. Because we must remand for resentencing in any event, we need not resolve the merits of this claim. Wood will have the opportunity to assert his claim under *Dueñas* at the new sentencing hearing.

## 5. *Presentence Credits*

At sentencing, the trial court awarded 749 total days of presentence credits to Wood, calculated as 652 actual days plus 97 days under section 2933.1. Wood contends this calculation is incorrect and requests we remand for the trial court to determine the correct number of presentence credits. The Attorney General concedes this claim. We reject the Attorney General's concession.

Wood's claim relies on the initial probation report, which was subsequently corrected in a supplemental probation report. The supplemental report of April 26, 2019 corrected various errors in the initial report and set forth the basis for the trial court's presentence credits calculation as follows: Wood was arrested on June 28, 2017, and the trial court sentenced him on April 26, 2019, after 668 calendar days had passed. But after

_____

[3] This issue is currently under review in the California Supreme Court in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.

Wood was arrested in this case, he was sentenced for a violation of probation in another case docketed No. C1653057 and granted 32 total days of credit. Accordingly, the supplemental probation report calculated Wood's actual days in custody in this case after deducting 16 days for the actual time he spent in custody on the other case. The 16-day deduction resulted in 652 days of actual custody at the time of sentencing. Under section 2933.1, Wood was entitled to additional 15 percent reduction in time, equal to 97 days of additional credit.

Accordingly, the trial court properly awarded 749 days of total presentence credits. We conclude this claim is without merit.

### III.    DISPOSITION

The judgment is reversed and the matter is remanded for resentencing in accordance with Penal Code section 1170, subdivision (b), as amended by Senate Bill 567 and Assembly Bill 124. The trial court shall also strike the one-year prior prison term enhancement imposed under former section 667.5, subdivision (b), and vacate any portion of the $129.75 criminal justice administration fee that remained unpaid as of July 1, 2021.

_____
Greenwood, P. J.

WE CONCUR:

_____
 Grover, J.

_____
 Lie, J.

People v. Wood
H047308